[Crim. No. 9082. In Bank. Mar. 2, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. PAUL EUGENE La VERGNE, Defendant and Appellant.

A. Lee Estep, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—Defendant, and one Cecil Larry Watters, who has not been apprehended, were charged in count I of an indictment with the murder of Peter Giacalone. In counts II and III defendant alone was accused of robbing Robert Marvin Willingham, and of assaulting him by means of force likely to produce great bodily injury. On all counts defendant entered pleas of not guilty and not guilty by reason of insanity, but the latter plea was withdrawn at the commencement of trial. His motion for a separate trial as to count I was denied, and the jury returned verdicts finding him guilty of first degree murder on count I, first degree robbery on count II, and assault by means of force likely to produce great bodily injury on count III. The question of penalty on the murder conviction was submitted to the jury upon the evidence received at the guilt phase of the trial, and it was determined that defendant should suffer death. The judgment provided that prison terms for counts II and III were to run consecutively with each other and with the death sentence. This appeal is automatic pursuant to section 1239, subdivision (b), of the Penal Code.

At approximately 5 a.m. on January 7, 1965, Peter Giacalone, a Los Angeles cab driver, was beaten and strangled to death by two men in an alley in Imperial Beach. In the vicinity of his cab, which was parked near the alley, were found a cigarette lighter, a pair of sunglasses, later identified as belonging to Watters, a hat later identified as belonging to defendant, and some loose $1.00 and $5.00 bills. The trip sheet in the cab showed $14.50 in fares since the commencement of Giacalone's shift, but no money was found on his body and the wallet was not located. Quantities of blood were on the cab and the ground near it.

About 6:45 a.m. of the same day defendant approached two men in a restaurant near the scene of the crime and asked for

a ride to the Coronado Ferry. They consented, and the three conversed during the trip, defendant stating that he had been "rolled" in Imperial Beach and had insufficient money to return to San Diego. Defendant was dropped off in Coronado. Shortly thereafter, and four or five blocks away, defendant approached another cab driver, Robert Marvin Willingham. Defendant stated to Willingham that he wished to be driven to San Diego but that he had no money, and that if Willingham would first drive him to a certain address in San Diego he could obtain money for the fare. Willingham consented to the arrangement, paid the ferry charge, and drove defendant to the San Diego address. Defendant left the cab briefly, then returned and told Willingham to drive to another San Diego address, where again he left the cab briefly. When defendant returned, Willingham inquired about the fare, whereupon defendant attacked and severely beat him. After Willingham regained consciousness he discovered that his cab was gone.

An all-points bulletin issued seeking a person described as a Negro and driving Coronado Yellow Cab No. 23. Defendant was immediately apprehended in the cab and placed under arrest. At the police station, he was searched, and on his person were found a pair of sunglasses, a memo book, a money clip, two Los Angeles bus transfers, and a handwritten note. The note read as follows: "Don't Play Hero. Just Give Me All Your Money! Anything Goes Wrong You Will Be the first to die! Quick!!" (Emphasis in original.)

Defendant's person and clothing were examined for bloodstains. Stains on his hands, knees, and coat were found to be composed of type A blood. Peter Giacalone's blood was type A. Defendant's blood was type O, as was Willingham's.

An examination of Giacalone's cab disclosed palm prints which, in the opinion of a police fingerprint and identification expert, were made by defendant.

At the trial the prosecution introduced the testimony of a police officer relative to two sessions of interrogation in which defendant was engaged shortly after his arrest. The first of these took place almost immediately after defendant's arrival at the police station, but by reason of defendant's belligerence the questioning was confined to an attempt to learn his name. Defendant's first answer to the question of his identity was "I don't have any name. You brought us over here from Africa and gave us names." When officers sought to calm defendant, suggesting to him several common

names, defendant replied "Those are all European names, white man. I'm an African." Officers then made further attempts to calm defendant, stating that they merely wanted to ask a few questions "man to man." At this point defendant rose in his chair, clenching his fists, and cried "What do you mean man to man, white man. I'm three times the man you'll ever be." It appearing that further questioning at that time would be futile, the interrogation was terminated and defendant was taken to jail. At no time during this conversation was defendant advised of his constitutional rights.

The same morning at about 10:30 defendant was returned to an interrogation room for a second attempt at questioning. He was at this point advised "that he was not required to make any statement, that any statement he did make could be used in court as evidence and that he had the right to an attorney." However, no detailed statement of the right to legal assistance was made, and defendant was not told that his "right to an attorney" included the right to legal assistance during the interrogation itself. Defendant was then asked, and did answer, several questions as to his name, birthdate, and place of residence. He was also asked if he had ever been in Coronado or Imperial Beach, and he answered that he might have been in Coronado before 1960 but had not been in either place since. In response to further questions he represented that he had left Los Angeles with a friend about midnight the evening before, that he arrived in San Diego about 4 a.m., that he then unsuccessfully attempted to locate some friends, that he saw an unoccupied cab parked at the curb and drove it away towards Los Angeles.

At this point defendant was asked whether he wanted to call an attorney, but he replied "No, I don't want any attorney or public defender. I would rather defend myself."

The interrogation continued, marked by defendant's refusal to answer questions concerning his whereabouts during the early morning hours. Defendant, when asked to explain what appeared to be bloodstains on his clothing, replied "I know where they came from but I'm not going to tell you." Asked about the handwritten note quoted above, defendant represented that he wrote it in Los Angeles several days earlier "to use it for just what it says, to get money," but that he never had a chance to use it. At the end of the interrogation defendant was asked if he had anything further to say, and he said "Nothing except I did wrong and I'll pay the penalty."

Defendant did not testify at the trial, and he presented no evidence in his own behalf.

■ Defendant first contends that the trial court erred in denying his motion to sever count I, the murder count, from the remainder of the indictment, and that he was prejudiced by the combined trial of all three counts in that the jury was confused as to which of the two robberies need be proved in order to apply the felony-murder doctrine. This contention is without merit. It is proper to charge multiple offenses in a single indictment and join them for trial pursuant to section 954 of the Penal Code "where there is a common element of substantial importance in their commission." (*People* v. *Chapman,* 52 Cal.2d 95, 97 [338 P.2d 428].) Here the two victims were cab drivers, and both were severely beaten, though the direct cause of Giacalone's death was strangulation. Both offenses occurred in the same general area and during the same general period of time, implying that they were parts of a single expedition. Further, our examination of the trial record establishes that the possibility of confusion to which defendant refers was effectively negated by the arguments of counsel and the court's instructions. The trial court's refusal to permit severance did not constitute an abuse of discretion.

■ Defendant next contends that certain extrajudicial statements made by him to officers in the interrogation room on the day of the crime were erroneously admitted into evidence, citing *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. We need not consider this point, however, because it is clear that defendant was fully and properly cautioned before he uttered any statement prejudicial to his defense. The admission of the exculpatory and evasive statements made before the caution was effectively administered could in no way be said to work a miscarriage of justice as contemplated by article VI, section 4½, of our Constitution. The only statements of conceivable prejudicial effect were given after defendant had been advised of his right to remain silent, had been informed of his general right to an attorney, had been asked whether he wished to call an attorney for present assistance, and had expressly stated that he did not wish to have legal assistance.

■ Several rulings of the trial court, as to the relevancy of certain evidence offered by the prosecution, are next challenged by defendant. He urges first that the handwritten note found upon his person was improperly received over

objection because its probative value was outweighed by its prejudicial effect. We cannot agree. The prejudicial effect of the note, while great, was clearly subordinate to its probative value, for it not only demonstrated a preexisting intent to commit robberies, but was also evidence of an intent to kill any victim who resisted.

■ Likewise, a colored slide and three photographs showing the battered head and neck of Giacalone were properly admitted, for their probative value in demonstrating malice and in accounting for the blood found on defendant's person was substantial. The record clearly shows that the trial court carefully considered objections to the slide and photographs both at the time of their introduction and during argument upon the motion for new trial. No abuse of discretion appears. (See *People* v. *Nye*, 63 Cal.2d 166, 170 [45 Cal.Rptr. 328, 403 P.2d 736].) ■ A silent motion picture film of Willingham exhibiting his injuries was also properly admitted, for it showed the extent of those injuries, a fact important to the determination of whether he had been assaulted by means of force likely to produce great bodily injury.

■ There is merit, however, in defendant's contention that the trial court committed error when it admitted over proper objection testimony relative to the first session of interrogation. Defendant's belligerent reaction to the officers' original interrogatories was probative of only one fact—that defendant, a Negro, harbored a deep feeling of resentment against white persons in general. Any proper inference which the jurors could draw from the fact of defendant's prejudice against Caucasians, and the further fact that the two victims were white persons, could have only slight probative value. On the other hand, the recounting of defendant's actions and statements undoubtedly served to inflame the minds of the jurors against him. It is clear that the prejudicial effect of this testimony outweighed its probative value, and that it therefore was erroneously admitted over proper objection. However, it is equally clear that this error, viewed in the context of clear and convincing evidence of guilt, did not result in a miscarriage of justice within the meaning of article VI, section 4½, of our Constitution.

■ Finally, defendant argues that the court erroneously gave an instruction, requested by the prosecution, that "a homicide resulting from strangulation indicates malice," and erroneously refused a defense instruction to the effect that a homicide resulting from beating or strangulation cannot be

murder of the first degree unless committed in the perpetration of arson, rape, burglary, robbery, mayhem, or child molestation. It is patent that the proposition set forth in defendant's requested instruction finds no support in the law, and that a premeditated stangulation would be murder of the first degree. The instruction requested by the prosecution and given by the court, to the effect that homicide by strangulation indicates malice, was proper. (*People* v. *Caldwell*, 43 Cal.2d 864, 869 [279 P.2d 539].)

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.