[Crim. No. 9736. In Bank. Apr. 24, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FLORENCE ADA ARNOLD, Defendant and Appellant.

Peter G. Fetros, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Raymond M. Momboisse, Edward A. Hinz, Jr., and Daniel J. Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

TOBRINER J.—Following the death of her 13-year-old daughter, Sandra Kay Arnold, the grand jury returned an indictment charging defendant with the crime of manslaughter. A jury found defendant guilty as charged; the court granted probation on the conditions that defendant be confined in jail for a period of one year and that, in the event that any minor child in her care became ill, she should report to the probation officer and call a doctor.

For the reasons stated below we hold that the trial court committed reversible error in admitting into evidence defendant's extrajudicial statement; the prosecution failed to show that the statement was not obtained in violation of defendant's constitutional rights. For guidance of the court on retrial we take this occasion to reject defendant's further

arguments that the trial court should have excluded as unduly prejudicial a photograph of Sandra taken after her death and that the trial court erred in giving instructions to the jury based on Penal Code sections 270 and 272.

According to the testimony of Dr. Wallace, who performed an autopsy on Sandra, a wad of human hair two and one-half inches long, jammed into the small intestine, produced her death. The hair ball totally blocked the intestine, causing obstruction of the bowels and aspiration of fecal material into the lungs. Dr. Wallace testified that a larger hair ball had formed in Sandra's stomach over a period of several months; part of it had probably broken off and moved into the small intestine. Such an obstruction would cause fever, pain, weakness, vomiting and such other indicia of serious illness. The doctor further testified that an operation performed up to 12 hours before Sandra's death would probably have saved her life.

The most damaging part of the prosecution's case against Mrs. Arnold consisted of a transcription of an interrogation of defendant by a deputy district attorney in the course of which defendant described Sandra's terminal illness. According to the statement, Sandra became ill on May 2, 1964; she complained of stomach pains and vomited several times. Over the following days defendant kept Sandra at home in a specially obtained hospital bed, gave her enemas, and applied compresses. Sandra's condition began to deteriorate, and defendant called members of the Church of the First Born,[1] who came to the Arnold home on May 15 and prayed for Sandra.

Defendant realized at this time that Sandra was gravely ill, since the girl could not walk unassisted, could not retain liquids fed her, could not normally excrete bodily wastes, and was losing weight. Defendant, although aware that Sandra might die, did not obtain a doctor for her because of defendant's religious convictions against using medical assistance. On May 19 Sandra had a 25-minute convulsion; on May 20 defendant and other members of the church took Sandra to the river, where she was immersed and baptized. Three hours later Sandra died.

The trial court instructed the jury that it could find defendant guilty of manslaughter if it found that defendant

---

[1]The Church of the First Born, to which defendant belongs, is a religious group believing in faith healing.

had violated Penal Code section 270[2] or section 272,[3] which describe misdemeanor offenses, that such violation had caused death, and that defendant had acted in a manner dangerous to life and knew, or should have known, of this danger.

Defendant attacks the admissibility of her extrajudicial statement to the deputy district attorney; she claims that the deputy district attorney did not first advise her of her rights to counsel and to remain silent pursuant to *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Examining the record in the instant case we explain why we cannot assume that the statement was elicited prior to the advent of the accusatory stage described in *Escobedo* and *Dorado*. ▆ [See fn. 4] Since the defendant was not then informed of her rights to counsel and to remain silent we find that the admission into evidence of the statement constituted error.[4]

---

[2]Penal Code section 270 provides in part: ''A father of . . . a . . . minor child who willfully omits without lawful excuse to furnish necessary clothing, food, shelter or medical attendance or other remedial care for his child is guilty of a misdemeanor . . . .

''Proof of . . . the omission by such father to furnish necessary food, clothing, shelter or medical attendance or other remedial care for his child is prima facie evidence that such . . . omission to furnish necessary food, clothing, shelter or medical attendance or other remedial care is willful and without lawful excuse. . . .

''In the event that the father of . . . a . . . minor child is dead or for any other reason whatsoever fails to furnish the necessary food, clothing, shelter or medical attendance or other remedial care for his minor child, the mother of said child shall become subject to the provisions of this section and be criminally liable for the support of said minor child during the period of failure on the part of the father to the same extent and in the same manner as the father.'' Sandra's father, Lee J. Arnold, lived in Louisiana. He and defendant were divorced in 1961; defendant had been awarded sole custody of Sandra.

[3]Penal Code section 272 provides in part: ''Every person who commits any act or omits the performance of any duty, which act or omission causes or tends to cause or encourage any person under the age of 21 years to come within the provisions of Sections 600, 601, or 602 of the Welfare and Institutions Code . . . is guilty of a misdemeanor . . . .''

Welfare and Institutions Code section 600 provides in part: ''Any person under the age of 21 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court: . . .

''(b) who is . . . not provided with the necessities of life . . . .''

[4]Defendant's trial took place in October 1964 after the decision in *Escobedo* but before the United States Supreme Court decided *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974]. In adjudicating defendant's contention we therefore apply the *Escobedo-Dorado* principles, but not the more stringent *Miranda* rules. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 691 [56 Cal.Rptr. 293, 423 P.2d 221].)

Defendant rendered the questioned statement during an interrogation at the office of the deputy district attorney. The deputy had notified her to come to his office to discuss the circumstances of Sandra's death. She did so; she testified at trial, "I didn't know I didn't have to come down and talk to you, or I wouldn't have. . . ."[5] The deputy queried her for one hour and forty-five minutes. No one else was present on the occasion except an attaché of the district attorney's office who transcribed the interrogation; he took no part in the questioning. At this point defendant had not been placed under arrest.

The attaché who transcribed the statement testified that the deputy district attorney did not advise defendant of her right to counsel, but that defendant had not requested an attorney before or during the interrogation. The trial court, however, after hearing this testimony, permitted, over objection, the introduction of the statement; the trial court held the request a condition to the accrual of the constitutional right. The ruling thus conflicted with our decision, rendered subsequent to the trial, in *People* v. *Dorado, supra,* 62 Cal.2d 338.

■ *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado, supra,* 62 Cal.2d 338, require that a suspect be advised of his right to counsel and his right to remain silent once the accusatory or critical stage has been reached. In *People* v. *Dorado, supra,* 62 Cal.2d 338, at page 353, we listed the factors which coalesced to signal the advent of the accusatory stage: "(1) [T]he investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect[;] (2) the suspect was in custody[;][6] (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements. . . ."

---

[5]The Reporter's Transcript states:
"Q. And isn't it true that you talked to me voluntarily, and there were no promises or threats of any kind made to you at any time?
"A. No promises or threats. I didn't know I didn't have to come down and talk to you, *or I wouldn't have came.* This was—
"Q. I didn't ever tell you that you had to come down and talk to me, did I, ma'am?
"A. *I thought that I had to, though.* You said for me to come down and talk to you." (Italics added.)

[6]We noted in *People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], that "arrest encompasses [the first two] circumstances which produced the accusatory stages in the *Escobedo* and *Dorado* cases . . . ." (62 Cal.2d at p. 577.) When, however, as in the instant case, the defendant was not under arrest at the time of making the statement we must determine whether the investigation had focused on a particular suspect and whether the suspect was in custody. (*People* v. *Furnish* (1965) 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299].)

We shall point out, first, that the record in the instant case demonstrates that the investigation had "begun to focus" on defendant; second, that in determining whether defendant was "in custody" the court must decide whether she was physically deprived of her freedom of action in any significant way or was led to believe, as a reasonable person, that she was so deprived, but that the record is incomplete on this issue and the case must be remanded for retrial in order to develop the pertinent facts; third, that the deputy carried out a process of interrogations that lent itself to eliciting incriminating statements; fourth, that the introduction of the statements into evidence caused prejudice to defendant.

█ Turning to the first point, we find that in the instant case "the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect." The record indicates that, prior to the formal interrogation of defendant, the deputy district attorney had determined that Sandra's death resulted from a felony and that defendant perpetrated the crime.

The questions asked during the session strongly suggest that *before* the interrogation occurred the deputy had reason to believe that Sandra had been extremely ill for several weeks before her death, that defendant had not obtained medical assistance for Sandra during the terminal illness, that defendant's religious beliefs would not permit the summoning of a doctor for Sandra, that members of defendant's church had immersed Sandra in the river several hours before she died, that Sandra was in the custody of her mother, and that Sandra's father lived in Louisiana. The deputy also had in his possession the autopsy report. Moreover, defendant and other members of the Church of the First Born had previously talked with various law enforcement officials about the death. We therefore conclude that at the time of the interrogation the deputy had strong reason to believe that defendant was guilty of manslaughter.

█ The second issue, whether defendant was in custody at the time she made the statement, presents the crucial problem of the case. Although we have consistently and expressly held that custody constitutes an essential element of the accusatory stage, we have recognized that custody could occur in a situation in which defendant had not been arrested but his freedom of movement curtailed. In the instant case we are called upon to define more precisely the elements in the curtailment of that freedom of movement.

We stated in *Ballard*: "At no time have we discarded custody as an essential element of the accusatory stage. The dangers that *Escobedo* and *Dorado* sought to deter, such as coercion, can only take place if a suspect is in custody." (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 169 [49 Cal.Rptr. 302, 410 P.2d 838].) There, the prosecutrix, who charged the defendant physician with rape, had obtained incriminating statements from the defendant at his office with an electronic microphone concealed on her person. We ruled that the physician was not in custody. Likewise, we held in *People* v. *Williams* (1965) 63 Cal.2d 452, 460 fn. 7 [47 Cal. Rptr. 7, 406 P.2d 647], that defendants, who "phoned the police and told them they were going to turn themselves in," were not then in custody.

But *Ballard* explains that, as we held in *People* v. *Furnish*, *supra*, 63 Cal.2d 511, custody can occur without the formality of arrest. In *Furnish* we said: "Of course in some situations where an investigation has focused on a particular suspect the authorities may, for reasons of their own and without advising the suspect, choose to detain him although he had not been formally placed under arrest. In that case the danger that such tactics may result in incriminating statements is as great as if the suspect had been formally arrested. In other words, if the formality of an arrest were a strict condition precedent to the advent of the accusatory stage, the police could, by delaying the arrest where the situation did not demand one, circumvent the accused's right to counsel and nevertheless subject him to tactics designed to elicit incriminating statements." (63 Cal.2d at p. 516.)

In *People* v. *Chaney* (1965) 63 Cal.2d 767 [48 Cal.Rptr. 188, 408 P.2d 964], the defendant, to forestall arrest, appeared voluntarily at the sheriff's office. In finding that he was in custody we stated: "It readily can be inferred that because of information already in the hands of the inspector, defendant was not free to leave from the moment he appeared." (63 Cal.2d at p. 769; see also *People* v. *Bostick* (1965) 62 Cal.2d 820, 835 fn. 5 [44 Cal.Rptr. 649, 402 P.2d 529].)

In the recent case of *People* v. *Kelley* (1967) *ante*, p. 232 [57 Cal.Rptr. 363, 424 P.2d 947], defendant, who "was in the Navy . . . was . . . told to report . . . at the Naval Security Building" for questioning by a criminal investigator employed by the Navy. In finding that defendant was in custody during this interrogation we held, "The existence of

custody as an element of the accusatory stage does not depend on the subjective intent of the interrogator but upon whether defendant is placed in a situation in which he reasonably believes that his freedom of movement is restricted by pressures of official authority. An examination of *Escobedo* and *Dorado* demonstrates that these cases condemned the confession or incriminatory statement given by a defendant under the coercive circumstance of an actual *or apprehended* restriction upon his freedom of movement." (*People* v. *Kelley, supra, ante,* pp. 232, 246.

The vice of the custodial interrogation which these cases condemned lay in the psychological coercion implicit in interrogation in the isolated chamber from which the suspect may reasonably believe he cannot leave. In such circumstances the person detained or arrested finds himself completely and suddenly cut off from freedom of movement. An involuntary immobilization by law enforcement officers dramatizes the fact that the individual stands suspected or accused of crime. Lacking knowledge of his constitutional rights, he may feel that he can extricate himself from the situation only by submitting to interrogation. He may reasonably believe that if he attempts to leave the interrogation chamber the authorities will impose immediate detention.[7]

In holding that such interrogation without the required advice violates the principles of the privilege against self-incrimination, the United States Supreme Court in *Miranda* v. *Arizona, supra,* 384 U.S. 436, declares: "We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than

---

[7]Webster's New International Dictionary (3d ed.) defines custody as: ". . . (2) judicial or penal safekeeping; control of a thing or person with such actual or constructive possession as fulfills the purpose of the law or duty requiring it: imprisonment or durance of persons or charge of things."

Black's Law Dictionary (4th ed.) defines custody as: ". . . [T]he detainer of a man's person by virtue of a lawful process or authority; actual imprisonment. . . . Detention; charge; control; possession. The term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession."

in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.'' (P. 461, fn. omitted.)

In stressing that ''the modern practice of in-custody interrogation is psychologically rather than physically oriented'' (p. 448), the Supreme Court examines the police manuals and texts which recommend ''effective tactics'' of custodial interrogation and then notes that ''The officers are told by the manuals that the 'principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation.' '' (P. 449.) Most significantly, that court, in discussing the facts of the cases before it, states: ''In each, the defendant was questioned by police officers, detectives, or a *prosecuting attorney* in a room in which he was cut off from the outside world.'' (Italics added.) (P. 445.) Thus the court expressly does not distinguish between the interrogation by the police officer, which is the most frequent procedure, and that by the prosecuting attorney, which occurred in the present case. The coercive effect does not disappear because the instrumentality of interrogation is a prosecuting attorney instead of a police officer or because the locale of the query is the chamber of the prosecutor rather than the policeman.

Although in this pre-*Miranda* case we are not constitutionally compelled to accept *Miranda* standards, we find the above reasoning entirely persuasive in defining custody as that term is used in *Escobedo* and *Dorado*. Accordingly, we adopt the definition of the United States Supreme Court of in-custody interrogation: ''By *custodial* interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'' (Italics added.) (384 U.S. at p. 444.) We hold that custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived.

 Applying the foregoing definition, we find that the prosecution has failed to sustain its burden of showing that defendant was not in custody at the time she made her statement. (See *People* v. *Davis* (1967) *ante*, pp. 175, 180-181 [57 Cal.Rptr. 130, 424 P.2d 682].) She testified that she believed she had no alternative other than to comply with an authoritative summoning for interrogation. (Cf. Graham, *What is ''Custodial Interrogation''?: California's Anticipa-*

*tory Application of Miranda* v. *Arizona* (1966) 14 U.C.L.A. L.Rev. 59, 79-80 & fn. 119.) She might reasonably have believed that if she had attempted to leave during the course of the interrogation the deputy district attorney would have arrested her or told police officers to physically detain her.[8]

We recognize that neither party at trial was motivated to develop a full record on this issue in view of the trial court's erroneous ruling that a request for an attorney constituted an essential element to the application of the *Escobedo* rule. (See *People* v. *Green* (1965) 63 Cal.2d 561, 565 [47 Cal.Rptr. 477, 407 P.2d 653].) ■■ On retrial the attention of the trial court should be directed to the precise language used by the deputy district attorney in summoning Mrs. Arnold to his office, to any statements of the deputy not transcribed, made before or after formal interrogation, and to the physical surroundings. The trial court should also consider the extent to which the authorities confronted defendant with evidence of her guilt,[9] the pressures exerted to detain defendant, and any other circumstances which might have led defendant reasonably to believe that she could not leave freely. (*People* v. *Furnish, supra,* 63 Cal.2d 511, 516; see Note, *Consent Searches: A Reappraisal after Miranda* v. *Arizona* (1967) 67 Colum.L.Rev. 130, 145-146.)

■■ We further find that the deputy district attorney had undertaken a process of interrogations that lent itself to eliciting incriminating statements. He contrived leading questions to extract from defendant the highly incriminating admission that she was aware of the gravity of Sandra's

---

[8]Cf. the following excerpt from O'Hara, Fundamentals of Criminal Investigation (1956) at page 99, quoted by the United States Supreme Court in *Miranda* v. *Arizona, supra,* 384 U.S. 436: " 'If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his own home. Moreover, his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.' " (384 U.S. at pp. 449-450.)

[9]In *People* v. *Furnish, supra,* 63 Cal.2d 511 at page 516, we explained that "the evidence of guilt in the possession of the police" is a factor to be considered in determining whether the accusatory stage has matured. This factor, of course, appropriately relates to whether the investigation has begun to focus on a particular suspect, but, if the authorities confront a suspect with this evidence, he might reasonably believe that his freedom is restricted.

condition but deliberately refused to obtain medical assistance. ■ We therefore conclude that the trial court committed error in admitting this statement into evidence since defendant was not advised of her right to counsel and her right to remain silent. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478; *People* v. *Dorado, supra,* 62 Cal.2d 338.)

Finally, we believe that the erroneous admission of this statement prejudiced defendant. Defendant's extrajudicial statement constituted the crux of the prosecution's case. Defendant described the course of Sandra's illness, Sandra's alarming physical symptoms which defendant observed, her ineffectual efforts by "home remedies" and prayer to aid Sandra, her deliberate refusal to summon a doctor, her realization of the extreme gravity of Sandra's condition, and her belief that Sandra might die unless "God took a hand," and finally her participation in the deathbed baptism. These revelations, amounting to a confession, must have seriously prejudiced defendant's case in a manner requiring reversal. (*People* v. *Schader* (1965) 62 Cal.2d 716, 728-731 [44 Cal. Rptr. 193, 401 P.2d 685]; *People* v. *Dorado, supra,* 62 Cal.2d 338, 356; see *Chapman* v. *California* (1967) 386 U.S. 18, 23 & fn. 8 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 828].)

This error was not cured by defendant's testimony at trial, during which she repeated on cross-examination much of the substance of her extrajudicial statements. ■ As we said recently in *People* v. *Spencer* (1967) *ante,* pp. 158, 163-164 [57 Cal.Rptr. 163, 424 P.2d 715], "In determining the effect of defendant's extrajudicial confession upon the outcome of the instant trial, we must consider the likelihood that it contributed to the verdict by *inducing* the defendant to admit his guilt in open court. If the improper use of defendant's extrajudicial confession impelled his testimonial admission of guilt, we could hardly sustain his conviction on the theory that his confession to the police, although inadmissible, merely duplicated his subsequent confession to the jury; in that event we could not, in order to shield the resulting conviction from reversal, separate what he told the jury on the witness stand from what he confessed to the police during interrogation." (Footnotes omitted.)

The state has not sustained its "burden of showing that the causative link between the two confessions had been broken." (*People* v. *Spencer, supra, ante,* pp. 158, 168.) Indeed, since "the prosecution . . . presented no substantial evidence of defendant's guilt apart from [her] extrajudicial confes-

sion, . . . the present case [is] controlled by our previous decisions holding that, under such circumstances, the defendant's testimonial confession must be deemed to have been impelled by the erroneous introduction of [her] out-of-court statement and that the resulting conviction must therefore be reversed.'' (*People* v. *Spencer, supra, ante,* pp. 158, 168, fn. 9; see *People* v. *Polk* (1965) 63 Cal.2d 443, 449 [47 Cal. Rptr. 1, 406 P.2d 641]; *People* v. *Davis* (1965) 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142].)

As we have noted, defendant urges as a second error the admission into evidence of a small black and white photograph of Sandra's nude body taken after her death. The trial judge, in his discretion, must determine the admissibility of such evidence. The test focuses upon whether the danger of prejudice outweighs the probative value of the evidence. (*People* v. *Polk, supra,* 63 Cal.2d 443, 450.) The noninflammatory photograph in question, introduced simultaneously with a photograph taken of Sandra before her illness, served to demonstrate that defendant should have noticed Sandra's loss of weight. We can find no abuse of discretion. (*People* v. *Thomas* (1967) 65 Cal.2d 698, 706 [56 Cal.Rptr. 305, 423 P.2d 233]; *People* v. *La Vergne* (1966) 64 Cal.2d 265, 271 [49 Cal.Rptr. 557, 411 P.2d 309]; *People* v. *Modesto* (1965) 62 Cal.2d 436, 443 [42 Cal.Rptr. 417, 398 P.2d 753]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 366 P.2d 677].)

Defendant thirdly contends that Penal Code sections 270 and 272, which served as the basis for the trial judge's instructions, could not as a matter of law apply here because the prosecution failed to prove that defendant possessed the ability to pay for Sandra's medical care. It is true that upon a demonstration of a defendant's financial inability to do so, courts have recognized a lawful excuse for failure to provide care. (See *People* v. *Smith* (1918) 38 Cal.App. 175 [175 P. 696]; *People* v. *Forester* (1916) 29 Cal.App. 460 [155 P. 1022].) In the instant case, however, defendant did not seek to justify her conduct by introducing evidence tending to show her inability so to provide.[10]

In this connection defendant claims that Penal Code section 270, penalizing the willful failure without lawful excuse to provide a minor child with ''necessary food, cloth-

---

[10]Under Penal Code section 270 (see fn. 2) proof of omission to furnish medical attendance constitutes prima facie evidence that the omission was willful and without lawful excuse.

ing, shelter or medical attendance or other remedial care'' cannot apply to her because she did provide an accepted alternative to medical attendance: ''other remedial care,'' namely enemas, compresses, and prayer. The phrase ''other remedial care,'' however, does not sanction unorthodox substitutes for ''medical attendance''; it indicates one of the multiple necessities which the parent must provide.

The judgment is reversed.

Traynor, C. J., Peters, J., and Sullivan, J., concurred.

MOSK, J.—I dissent.

All the progeny of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], have made it abundantly clear that four circumstances must concur in order to compel exclusion of a defendant's extrajudicial incriminating statement: (1) the investigation must have passed the stage of a general inquiry into an unsolved crime and be focused on a particular suspect; (2) the suspect must be either in custody or under the restraint of official detention; (3) the interrogation carried out by law enforcement officers must lend itself to eliciting incriminating statements from the suspect; and (4) the suspect must not have been effectively informed of his constitutional rights or, if so informed, he must not have knowingly and intelligently waived such rights. (*In re Lopez* (1965) 62 Cal.2d 368, 371-372 [42 Cal.Rptr. 188, 398 P.2d 380].)

As indicated above, the first requirement for application of *Dorado* inhibitions is that the law enforcement authorities progress beyond general inquiry into an unsolved crime. Obviously this presupposes knowledge of the existence of a crime. At the time of defendant's interview with the deputy district attorney on June 4, 1964, the authorities were in the process of a general investigation, not to ascertain who committed a certain crime, but to determine whether or not a crime had in fact been committed. While the autopsy report of May 21, 1964, revealed the medical cause of the child's death, no conclusion was yet reached that the physical condition had been induced by a criminal agency. The finger of suspicion could not focus on defendant as a criminal suspect prior to determination that a crime had been committed.

Thus condition number one for invoking *Dorado* fails. Even more significant, however, is absence of custody, the second qualification.

In *People* v. *Furnish* (1965) 63 Cal.2d 511 [47 Cal.Rptr. 387, 407 P.2d 299], this court explained (at p. 516) that while formal arrest is not essential to the advent of the accusatory stage, the circumstances must indicate "pressures short of arrest which the police exert to *detain* the suspect." (Italics added.) In no case, however, has this court gone so far as to hold that the *Dorado* rule becomes effective when no detention —actual or constructive, overt or subtle—is exercised. In *Lopez* (at pp. 372-373 of 62 Cal.2d) this court said that "we believe that the United States Supreme Court in *Escobedo* sought primarily to prevent police tactics which, in the past, have spawned involuntary confessions." Admittedly custody plays a role in the totality of coercive circumstances. If the freedom of motion of an individual is circumscribed or if he is involuntarily detained it is clear that he is at the very least a suspect and perhaps about to be cast in the role of a prospective defendant. The lesson of *Escobedo, Dorado,* and similar cases, is that this invokes pressures that may impel one to choose means not thoughtfully conceived in order to extricate himself. On the other hand, it is equally well settled "that not all questioning will constitute forbidden interrogation even under the most expansive reading of *Miranda.*" (Graham, *Custodial Interrogation* (1966) 14 U.C.L.A. L.Rev. 59, 96.)

This defendant was not in custody at the time of the June 4 interview with the deputy district attorney. No compulsion or threat of compulsion was exercised. She was not under arrest, and no hint of arrest had been made. She came by invitation, and she could have declined to appear. No police officer picked her up, and no police car was used to transport her. The interview was in an office under comfortable circumstances, and not in the jailhouse. No police officer, matron or uniformed personnel were present. The deputy district attorney made it clear that he was merely investigating and told the defendant simply that "you understand we have to look into this cause of death." No "trickery" was employed, as expressly forbidden in *Miranda* (384 U.S. at p. 476). It is irrefutable that the defendant could have left at any time during the interview, and indeed *she did leave* without incident when the interview was concluded. After the interview took place on June 4, 1964, the defendant retained her freedom and was not charged with a crime until an indictment was returned by the grand jury on July 14, 1964, some 40 days later.

Under these circumstances, it is indisputable that the

defendant was neither in custody nor in any type of constructive detention before, during, or after she freely and voluntarily went to the district attorney's office upon invitation and discussed the circumstances of her daughter's death. Indeed, interviews of this type are a familiar and reasonable aspect of preliminary law enforcement investigations into unusual occurrences, and have no such sinister significance as the majority attribute to them.

The defendant urges an anachronistic and impractical "subjective" concept in seeking to exclude her statements not because she *was* in custody but because she later testified that she *thought* she was in custody. Approval of this mere *ipse dixit* declaration of her thought processes—and rejecting all the objective evidence that no detention was contemplated or effected—is a giant departure from all accepted concepts of police restraint. The only way to avoid abuse is to adhere to our previously enunciated rule of requiring either actual or constructive custody or detention in fact. This court rejected a subjective test for interrogators in *People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97], affd. sub nom. *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. A subjective test sans the slightest factual corroboration is equally untenable for an interviewee.

In view of the fact that the defendant was interviewed during the investigatory stage of the proceedings when the prosecutor had not as yet ascertained that a crime had been committed, and that the interview took place when she was not in custody or otherwise detained, I would hold that the statement of the defendant was properly received in evidence.

The judgment should be affirmed.

McComb, J., and Burke, J., concurred.

Respondent's petition for a rehearing was denied May 24, 1967. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.