Filed 3/27/13  P. v. Davis CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THOMAS CLIFFORD DAVIS,<br><br>Defendant and Appellant. | B240302<br>(Los Angeles County<br>Super. Ct. No.  BA294113) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Thomas Clifford Davis challenges his conviction for second degree murder on the ground of insufficiency of the evidence.  We reject this contention and affirm.

## RELEVANT PROCEDURAL HISTORY

On October 10, 2006, an information was filed charging appellant with the murder of Therisita J. (Pen. Code, § 187, subd. (a)).[1]  Appellant pleaded not guilty. From August 2009 to November 2011, appellant was determined to be incompetent to stand trial (§ 1368).  On January 19, 2012, a jury found appellant guilty of second degree murder.  Appellant was sentenced to a term of imprisonment of 25 years to life.

## FACTS

A. *Prosecution Evidence*

In November 2005, Therisita J. lived with appellant in his grandmother's residence on Budlong Avenue in Los Angeles.  Therisita and appellant often socialized with Robert Baines, appellant's brother, as well as with Cynthia Young and her husband, Henry Castillo.  Appellant sometimes phoned Baines and Castillo to discuss events in his life.

Between 4:00 and 5:00 p.m. on November 25, 2005, appellant made a cell phone call to Baines, who was at a location about a two-hour drive from Los Angeles.  According to Baines, appellant said that while he and Therisita were "playing around," Therisita jumped on his back, fell forward, and hit her head. Appellant further stated that she felt dizzy.  Baines advised appellant to call for paramedics, ended the phone call, and drove back to Los Angeles.

---

[1]      All further statutory citations are to the Penal Code.

2

As Baines neared his own residence in Los Angeles, he received a second phone call from appellant, who said that Therisita had blood in her mouth and was not breathing. Appellant sounded disturbed, and repeatedly asked what he should do. When Baines inquired whether appellant had called for paramedics, he replied, "No. What am I going to do?"

Baines made a 911 call and went to appellant's residence on Budlong Avenue, where Baines encountered emergency personnel outside a security gate, including Los Angeles Fire Department Captain Clinton Arrigoni. Appellant came out of the residence but refused to open the security gate.

According to Arrigoni, appellant insisted that Therisita was not at the residence, and that his grandmother had felt ill, but had since recovered. An elderly woman came to the gate, identified herself as appellant's grandmother, and said that she was fine. Because appellant maintained there was no emergency, Baines returned to his home. After Baines left, Los Angeles Police Department (LAPD) officers arrived at appellant's residence, entered the premises for five minutes, came out, and declared the scene "all clear." The emergency personnel then left.

At 5:00 or 6:00 p.m., appellant phoned Therisita's daughter, Tiffany Trull. According to Trull, appellant asked her to call her grandmother and request that Therisita come home. Trull did so. Afterward, appellant phoned Trull several times, telling her that he and Therisita were about to go out for a meal, that they were happy, and that they planned to marry. At the time, Trull thought that appellant's calls were odd because he had never previously phoned her. At approximately 8:00 p.m., Trull learned that appellant had told Baines that Therisita had bumped her head. When Trull phoned appellant to inquire regarding the injury, appellant said that Therisita had left.

3

At approximately 7:30 p.m., Castillo phoned Young from his workplace and said that Baines had told him that Therisita had been injured. Castillo asked Young to check on Therisita. When Young drove to the Budlong Avenue residence, she saw appellant walking on the street. In response to Young's questions regarding Therisita, appellant said that the previous day, Therisita had hit her head while playing with his nephew.

At some point before 10:00 p.m. or 11:00 p.m, while Castillo was still at work, appellant told Castillo by phone that Therisita had been injured during some horseplay. Castillo advised appellant to call 911. Later, after Castillo finished work, he and Young sat on a porch near the Budlong Avenue residence, keeping an eye out for Therisita. They saw appellant walk by on the opposite side of the street, as if attempting to distance himself from them. Later, at approximately 11:00 p.m., appellant told Castillo by phone that something had happened to his grandmother. Young and Castillo walked to the Budlong Avenue residence, where they saw an ambulance carry away appellant's grandmother.

Between 1:00 and 2:00 a.m. the next day, November 26, 2005, appellant again phoned Castillo and said there was a fire in a garbage can behind a neighborhood church. Castillo advised appellant to make a 911 call. At approximately 4:00 a.m., Captain Arrigoni's firefighter unit received notice of a rubbish fire behind a church close to appellant's residence. When the unit responded, Arrigoni discovered appellant outside his residence. Arrigoni declined an offer of assistance from appellant, put out a fire in a dumpster behind the church, and left.

That morning, at approximately 9:30 a.m., Arrigoni's unit responded to a notice of a cardiac arrest in the vicinity of appellant's residence. Upon arriving, the firefighters discovered a group of people on the street, including appellant.

4

Appellant led Arrigoni and the other firefighters down an alley to Therisita's body, which was covered with a blanket. When the body was uncovered, appellant said, "Oh no," and remarked, "That's my girlfriend. I have been looking for her for two days."

Shortly after Therisita's body was discovered, LAPD detectives interviewed appellant, who said that Therisita had gone out and never come home. He also asserted that the previous day he had made an emergency call for paramedics to help his grandmother, who had fallen. When the paramedics arrived, his grandmother wanted no medical attention, so he sent the paramedics away. He later called for them a second time after his grandmother fainted.

On November 29, 2005, LAPD detectives again interviewed appellant. Appellant stated that while he and Therisita were playing, she began riding on his shoulders. He tripped, causing Therisita to fall forward and strike her throat on a table edge. As a result, she was unable to breathe, and blood flowed from her mouth. Despite appellant's efforts to help her, she died. Appellant believed that he was going to "go to jail for life," and panicked. He initially placed her in the backyard. According to appellant, the police officers who entered the residence did not notice her. Later, to deceive his grandmother, he brought Therisita back into the residence and positioned her so that she looked like she was asleep.[2]

Investigating officers found bed sheets in the dumpster where the fire had occurred. Inside appellant's residence, they discovered traces of blood on a coffee table and in the bathroom. In addition, a closet contained a blood stained comforter.

---

[2]    Audio recordings of the detectives' interview with appellant were played for the jury.

Dr. Raffi Djabourian, a forensic pathologist, performed an autopsy on Therisita's body. According to Djabourian, Therisita displayed pre- and post-mortem injuries. Among the former were significant injuries on her neck and collar bone, bruises on her left arm, and abrasions on her thighs. The pre-mortem injuries included what appeared to be fingernail marks on the sides of her neck, hemorrhages in her eyes, and injuries to the muscles and cartilage in her upper respiratory tract. In view of these injuries, Djabourian opined that Therisita's death was a homicide, and that she died from manual strangulation, rather than from choking caused by an accident.

B. *Defense Evidence*

Appellant presented no evidence.

## DISCUSSION

Appellant contends there was insufficient evidence of malice aforethought to support his conviction for second degree murder. He argues that the evidence at trial supported a conviction for no greater offense than involuntary manslaughter. He also suggests that in the alternative, the evidence established no offense greater than voluntary manslaughter. For the reasons discussed below, we reject these contentions.[3]

A. *Standard of Review*

Our inquiry follows established principles. "In determining whether the evidence is sufficient to support a conviction . . . , 'the relevant question is

---

[3] The jury heard instructions on first degree and second degree murder, as well as on voluntary and involuntary manslaughter.

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.)

B. *Governing Principles*

Appellant's contentions rely on the central distinction between second degree murder and manslaughter, namely, that malice is required for the former, but not the latter. "Second degree murder is defined as the unlawful killing of a human being *with malice aforethought,* but without the additional elements -- i.e., willfulness, premeditation, and deliberation -- that would support a conviction of first degree murder. [Citations.] . . . [¶] Malice, for the purpose of defining murder, may be express or implied. [Citation.] It is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' [Citations.]" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) Furthermore, "malice is implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'" (*People v. Lasko* (2000) 23 Cal.4th 101, 107, quoting *People v. Dellinger* (1989) 49 Cal.3d 1212, 1215.) So

7

defined, implied malice does not require an intent to kill. (*People v. Lasko, supra,* at pp. 111-112.)

In contrast, "manslaughter is the unlawful killing of a human being *without malice.*" (*People v. Nieto Benitez, supra,* 4 Cal.4th at p. 102.) Generally, involuntary manslaughter occurs "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Appellant's principal contention is that the evidence at trial showed no offense greater than involuntary manslaughter.

Appellant suggests, in the alternative, that the evidence showed only that when Therisita died, his state of mind was the "highly wrought emotion" characteristic of voluntary manslaughter based on a sudden quarrel or heat of passion. That crime, like involuntary manslaughter, does not require malice. (*People v. Lasko*, *supra*, 23 Cal.4th at pp. 108-109.) Generally, the factor that distinguishes murder from voluntary manslaughter based on a sudden quarrel or heat of passion is provocation. (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).) The requisite provocation is subject to several requirements. (*Id.* at p. 583.) The provocation must be caused by the victim, or reasonably attributed to the victim by the defendant. (*Ibid.*) Furthermore, although the provocative conduct may be physical or verbal, it "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at pp. 583-584.) The provocation is thus assessed under subjective and objective standards: it must actually motivate the defendant's conduct, and also be capable of arousing the passions of a "'reasonable person.'" (*Id.* at p. 584.)

8

C. *Involuntary Manslaughter*

We begin with appellant's main contention, namely, that he committed no offense greater than involuntary manslaughter based on criminal negligence. As appellant did not testify, this contention relies primarily on the account of Therisita's death that he provided to LAPD detectives, according to which appellant panicked after Therisita accidentally suffered fatal injuries. Additionally, appellant notes Baines's testimony that appellant and Therisita appeared to be "getting along beautifully" shortly before her death, and points to his period of incompetency to stand trial as suggesting that his mental state was compromised when Therisita died. According to appellant, the record establishes that Therisita surprised him by jumping on his shoulders, and that his misconduct (if any) resided solely in his negligent failure to drop her safely and obtain prompt medical assistance for her. He thus maintains that he acted without malice, and that his misconduct amounted to nothing more than criminal negligence.

This argument misapprehends our review for substantial evidence. We do not engage in independent factfinding, but instead affirm the jury's determinations if they are supported by any logical inferences grounded in the evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11-14.) At the outset, we observe that the record discloses evidence that is ordinarily adequate to show malice. Although the prosecution offered no testimony from a third party witness to Therisita's death, malice may inferred from the circumstances of the crime. (*People v. Lines* (1975) 13 Cal.3d 500, 505.) Here, the prosecution submitted expert testimony that Therisita died by strangulation. California courts have long held that this method of killing may support an inference of malice. (*People v. La Vergne* (1966) 64 Cal.2d 265, 272 ["[H]omicide by strangulation indicates malice."]; *People v. Caldwell* (1955) 43 Cal.2d 864, 869 ["Murder by strangulation indicates malice."];

9

*People v. Lynn* (1984) 159 Cal.App.3d 715, 726-727 [evidence that defendant killed victim by strangling him manually and with a ligature sufficient to show malice]; see *Shackleford v. Hubbard* (9th Cir. 2000) 234 F.3d 1072, 1078-1079 [evidence that defendant strangled victim with garrote was sufficient to show malice; applying California law].)

The key issue before us is whether the record contains sufficient evidence to support appellant's conviction, notwithstanding the absence of a third party witness to her death. We find guidance on this issue from *People v. Jones* (1965) 232 Cal.App.2d 379, 388-389 (*Jones*). There, the defendant and victim were engaged in a romantic relationship during which they sometimes argued. (*Id*. at pp. 381-382.) After the victim was found dead in her apartment due to strangulation, the defendant denied any role in her death and gave shifting accounts of his location and conduct when she died. (*Id*. at pp. 383-388.) Although there was no witness to the victim's death, the appellate court held the evidence was sufficient to support the defendant's conviction for second degree murder, pointing to the absence of "proof of circumstances of mitigation, justification or excuse," together with "the manner of the killing" and the "defendant's conduct following the homicide." (*Id*. at p. 389.)

We conclude that there is sufficient evidence to establish that appellant engaged in second degree murder, rather than involuntary manslaughter. Although here, unlike *Jones*, there is no suggestion of disharmony between appellant and Therisita before her death, there is adequate evidence that she was strangled manually. That evidence, coupled with appellant's deceptive conduct after her death and shifting accounts of his behavior, supports the reasonable inference that he killed her with malice.

Furthermore, nothing in the record compels the contrary determination. The jury was not required to credit appellant's account of Therisita's death, and no evidence regarding appellant's mental competency was admitted at trial. Although the record does not disclose appellant's reason for killing Therisita, this fact does not undermine his conviction for second degree murder, as the prosecution was not required to establish his motive. (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370.) Accordingly, we reject appellant's contention that the record establishes no offense greater than involuntary manslaughter.

D. *Voluntary Manslaughter*

In the alternative, appellant suggests that the evidence at trial showed no offense greater than voluntary manslaughter, arguing that he acted while "his reason was . . . disturbed or obscured by highly wrought emotion" when Therisita died. As explained below, the record compels no determination that appellant's act of strangulation was the result of provocation, rather than malice.

As explained in *United States v. Roston* (9th Cir. 1993) 986 F.2d 1287 (*Roston*), the requisite showing of provocation must attribute cognizable provocation to the decedent. There, the defendant and the victim went on a honeymoon cruise following their marriage. (*Id*. at p. 1289.) Other passengers noticed the defendant become angry at the victim when she misused some table utensils. (*Ibid*.) Later, some passengers saw the pair quarrelling on the ship's deck, but none were present when the victim went overboard and died from drowning. (*Ibid*.) When the defendant reported that his wife had gone overboard, his face displaced scratches which he attributed to an accident; when recovered, the victim's body showed signs of strangulation. (*Ibid*.) In affirming the defendant's conviction for second degree murder, the Ninth Circuit held that the evidence of a

11

struggle and manual strangulation was sufficient to show malice. (*Id*. at pp. 1289-1290.) In addition, the Ninth Circuit concluded that the district court properly refused to instruct the jury on voluntary manslaughter, reasoning that although the scratches on the defendant's face suggested the existence of a struggle, there was no evidence that the victim provoked it. (*Id*. at pp. 1290-1292.)

Although the decision in *Roston* applied federal law, we regard as it as instructive in view of the material similarities between federal and California law. Here, there is no evidence that Therisita provoked appellant at all, much less in a manner sufficient to "cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Manriquez*, *supra*, 37 Cal.4th at pp. 583-584.) Neither at trial nor during his interviews with detectives did appellant claim that Therisita provoked him into attacking her. Nor was there evidence of a verbal or physical struggle, as appellant displayed no wounds, and the LAPD officers who entered appellant's residence after Therisita's death found nothing suspicious. On this record, a reasonable jury had no basis to infer that Therisita provoked appellant to strangle her.

Appellant acknowledges the lack of direct evidence regarding Therisita's conduct immediately before her death, but suggests that this gap in the record supports the inference that the requisite provocation existed, in view of his harmonious prior relationship with Therisita. However, on review for the existence of substantial evidence, "a mere possibility affords no evidence whatever," and "'[m]ere conjecture, surmise, or suspicion is not the equivalent of reasonable inference.'" (*People v. Blinks* (1958) 158 Cal.App.2d 264, 266, quoting *People v. Bender* (1945) 27 Cal.2d 164, 186, abrogated on another ground in *People v. Lasko*, *supra*, 23 Cal.4th at p. 110.) Because the record discloses no

evidence of provocation, appellant's contention fails.[4]  In sum, there is sufficient evidence to support appellant's conviction for second degree murder.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:


WILLHITE, Acting P. J.


SUZUKAWA, J.

---

[4]     *People v. Lasko*, *supra*, 23 Cal.4th 101, upon which appellant relies, is inapposite, as it stands solely for the proposition that the intent to kill is not a necessary element of voluntary manslaughter.  (*Id*. at pp. 107-111.)  As explained above, nothing in the record compels a finding that appellant acted as the result of the provocation required for voluntary manslaughter.