**UNITED STATES of America,
Appellee,**

v.

**Jack I. CHIKATA, Appellant.**

No. 24298.

United States Court of Appeals,
Ninth Circuit.

May 26, 1970.

Martin J. Durkan (argued), of Durkan & Durkan, Seattle, Wash., for appellant.

J. S. Obernour (argued), Asst. U. S. Atty., Stan Pitkin, U. S. Atty., Western District of Washington, Tacoma, Wash., for appellee.

Before JERTBERG, WRIGHT and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant, a Seattle druggist, was convicted by a jury of income tax evasion,[1] for the years 1961, '62 and '63. He was sentenced to a year and a day on each count, the sentences to run concurrently, and to pay a fine of $7,500.00 on each of the three counts, to be non-cumulative. He appeals. We affirm.

In January, 1966, a group supervisor of the Internal Revenue Service, when work was low, selected at random from the Seattle telephone directory, ten names of pharmacists. From the income tax returns of this group, he designated three for audit and assigned Robert Anderson, a revenue agent in the supervisory group, to make the audit. One so designated was appellant's 1964 return, which showed a large amount of interest income compared to the reported business income. At this time, there was no thought of possible fraud, although the supervisor's group was commonly known as the fraud group because approximately one-third of its work consisted of cooperating with special agents in criminal investigations.

Anderson, after receiving the returns, called appellant and told him of the assignment and that he wanted to see his books and records on the '64 return. Appellant invited Anderson to his place of business. Upon arrival, Anderson found that appellant had only his 1965–66 records on hand. After an examination of these records, Anderson proceeded with an interview for background and history and made arrangements to return the next day for further information.

The following day, an examination was made of the 1964 bank records. The agent found that in 1964, appellant

---

1. 26 U.S.C. § 7201.

had deposited $36,000.00 into his checking account, an amount far in excess of his reported gross receipts of $23,000.00. In a hurried analysis of appellant's reported income from retained copies of prior returns to 1959, the agent arrived at a net worth statement amounting to $130,000.00 in assets at the end of 1964, including $17,000.00 in cash that appellant said he had deposited in his checking account in 1965.

During the course of the investigation, the agent found that appellant's cash register could record sales no larger than $9.99 and that appellant recorded sales over $10.00 by ringing the extra amount and writing down the $10.00 on a piece of paper. Sometimes, he told the agent, he forgot to write down the $10.00 sales and that this might occur two or three times daily. Armed with this information, the agent computed an unexplained increase in assets of $46,000.00 for 1959 through 1964, this being an amount that would equal three unreported $10.00 sales for each working day during the period. Based on this information, Anderson offered a referral report, suggesting that there was an indication of fraud. This report was reviewed and assigned to special agent Catlow of the Intelligence Division for preliminary examination. Anderson was assigned as a cooperating agent.

Appellant, in the meantime, had hired attorney Bernard Greene and so advised Anderson. Greene called Anderson and told him that he represented appellant. Although Catlow was informed of these facts, he did not contact Greene because Greene had not filed a power of attorney as required by the Internal Revenue regulations. Instead, accompanied by Anderson, he went to appellant's place of business. He there identified himself and advised appellant that he could have his attorney present, that he need not answer any questions, nor furnish any information. Appellant was told that the initial examination indicated a shortage of reported income. Appellant then called his attorney, who arranged for an appointment the next day at his office.

At this meeting, Greene expressed a willingness to cooperate with the agents. Catlow then questioned appellant, covering much of the same areas that Anderson had covered during the initial interviews. Some time later, John Durkan, another attorney, took over the case for the appellant.

## CONTENTIONS

Appellant charges that the lower court erred in the following particulars: (1) in admitting in evidence any facts directly elicited from the appellant by the government agents or indirectly by leads furnished by appellant; (2) in refusing to give appellant a fair trial; (3) in refusing to strike all exhibits and testimony offered in violation of the court's order; (4) in instructing the jury to consider only the net worth of appellant; (5) in overruling appellant's motion to dismiss on the ground that the statute under which he was indicted was unconstitutionally indefinite; (6) in failing to exclude exhibits acquired by the special agent by use of an administrative summons; and (7) in ordering the appellant to stipulate as to the authenticity of certain government exhibits.

## CONTENTION ONE

Appellant argues that all evidence acquired by Anderson and Catlow during the course of their interviews with appellant and any evidence acquired as a result of leads obtained from appellant, during those meetings, was inadmissible because at no time was appellant given the necessary *Miranda* type warning. We note that appellant was in his own place of business on the occasion of the conversations with the government agents. He was not in custody, nor at the time was he, in any way, deprived of his freedom. In these circumstances, we are controlled by a number of our own authorities, which have refused to enlarge the *Miranda* rule beyond its stated limits. Spahr v. United States, 409 F.2d 1303, 1304–1305 (9th Cir. 1969), cert. denied 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91; Simon v. United States, 421 F.2d 667 (9th Cir. 1970).

In *Simon*, we declined to follow United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969), the principal case on which appellant relies. In Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L. Ed.2d 381 (1968), on which appellant also leans, the taxpayer was *in custody* in a state prison on another charge at the time he was questioned by Internal Revenue Agents. The Court, in *Mathis,* again limited *Miranda* to a person in custody or otherwise deprived of his freedom in some significant way. We resolve this issue against appellant. Additionally, we hold there was no coercive conduct on the part of the Internal Revenue Agents.

### CONTENTION TWO

▆▆▆▆ Appellant here charges that he was deprived of a fair trial because he was harassed by the Internal Revenue Agents and by the trial court. With a few exceptions, the complaints are those of the attorney, rather than appellant, and are concerned with what occurred during pretrial hearings, rather than during the trial. Of course, what occurred in the pretrial hearings can have no bearing on the fairness of the trial unless some relationship is shown. Our examination of the record reveals no such connection and appellant points to none. Additionally, our examination of the record leads us to the conclusion that the trial court's actions in the pretrial hearings were fully justified. The alleged harassment by the Internal Revenue Service, during the pretrial period, is completely irrelevant.

▆▆▆▆ During the trial, the court asked appellant's counsel not to "be so aggressive", told appellant's counsel that a certain question was propounded in "an improper way" and on one occasion, in commenting on counsel's repetitious interrogation, commented, "It is just ridiculous." Read in context with the relevant questions, we find nothing objectionable in the court's comments. In his closing argument to the jury, counsel for appellant referred to his client, who was born in Japan, as a sick old man who was imprisoned by the United States in a World War II concentration camp. He had emphasized this internment throughout the trial. Responding to this argument, the United States Attorney called attention to the fact that the concentration camps were established as a result of the sinking of American battleships in Pearl Harbor. Neither argument had anything to do with the merits of the case. While we do not condone this type of argument by a prosecuting attorney, we have no doubt that the prosecutor's response was prompted by the argument of appellant's own counsel. In these circumstances, we do not feel that the prosecutor's conduct should be treated as reversible error.

### CONTENTIONS THREE AND SEVEN

These contentions are related and should be considered together.

▆▆▆▆ Acting under the authority of Rule 17.1, F.R.Crim.P., the trial court, after a lengthy pre-trial conference, ordered appellant's counsel to examine government proposed exhibits 1 through 41 and appear some seven days later and then give reasons why he and his client should not stipulate to the authenticity of such exhibits, reserving all objections to relevancy and materiality. During the course of the conference, appellant's attorney took the position that the exhibits were inadmissible on various grounds, but did not challenge their identity or authenticity. Repeatedly, the court explained to appellant's counsel that the stipulation as to identity and authenticity of the documents would in no way prejudice future objections to admissibility on any other ground. Appellant's counsel finally said that he did not care to stipulate, under any circumstances, being of the belief that he should not, in any way, help the government meet its burden of proof. After this statement by counsel, the court explained that Rule 17.1 required a certain amount of cooperation by a defendant in

a criminal case and the court had power to require counsel to study the documents in order to determine whether he had a valid reason for doubting their authenticity. The transcript of the hearing makes it patently clear that appellant's counsel was given every opportunity to study the documents, as well as the list of the proposed witnesses who would authenticate the exhibits, if called for that purpose. The hearing was held on February 3, 1969. Appellant and his counsel were ordered to return on February 10th and state their reasons for not agreeing to the authenticity of the proposed exhibits. Instead of returning on February 10th and stating reasons for not agreeing to the exhibits, the appellant and his attorney signed the stipulation, which had been prepared by the government. The instrument was filed with the Clerk on February 7th.

Appellant and his attorney now contend they were intimidated into signing the stipulation. We do not agree. Although the court was forceful, and, to an extent, even demanding in his efforts to "promote a fair and expeditious trial" under the provisions of Rule 17.1, we hold that the record does not support a finding that he exercised his persuasion beyond permissible limits. The record makes it perfectly clear that appellant and his attorney were given the opportunity and, for that matter, were instructed to return on February 10th and then state any and all objections they might have to signing the stipulation. Then, and only then, the record makes clear, would the judge decide what future action, if any, might be appropriate.

■ During the trial, the court received in evidence exhibits in addition to those mentioned in the stipulation. Appellant, in urging error, calls attention to the court order requiring the government, in advance of trial, to disclose all of its exhibits and the names of its witnesses.

The record of the pretrial conference makes it quite apparent that the main purpose of stipulating to the authenticity of exhibits 1 through 41 was to avoid calling over 20 witnesses to identify the documents. Nothing said in the conference indicates that these would be the only exhibits offered by the government. The judge who was responsible for the disclosure order, in ruling on this contention, found it completely without merit.[2] So do we. Far in advance of the trial, the appellant and his attorney were made aware of the fact that the government was going to use the "net worth method of proof" and that the material supplied to appellant prior to trial would be illustrated and amplified during the course of the trial. The additional exhibits and testimony to which appellant objects are in connection with those subjects.

### CONTENTION FOUR

■ Next, appellant argues that the court erred in instructing the jury to consider only the net worth of the appellant and not of his wife. In this connection, the court carefully instructed the jury that in the state of Washington a wife had a vested property right in the community property and in the income of the community equal to that of her husband. Beyond doubt, the prosecution was premised on the net worth of the appellant, rather than that of his wife. There is no claim that the separate property of the wife in any way contributed to the net worth of appellant as shown by the record. This contention is patently groundless.

### CONTENTION FIVE

■ Appellant challenges the constitutionality of 26 U.S.C. § 7201, the stat-

2. "Moreover, in this particular case far beyond anything in my experience in dealing with literally hundreds of tax evasion cases, there has been an extraordinary disclosure made to the defendant and his counsel of the evidence to be offered by the government. Never before have I ever required so sweeping disclosure as has been voluntarily offered by the government in this case." (T.R. Vol. IV, p. 355.)

**390**

ute under which he was convicted. He says the statute is too vague. It does not, he argues, set up standards which are ascertainable and understandable by men of ordinary intelligence. Appellant cites no specific authority for his position. Insofar as we can determine, the only cases considering the subject have held the statute constitutional. United States v. Schipani, 362 F.2d 825 (2d Cir. 1966), cert. denied 385 U.S. 934, 87 S.Ct. 293, 17 L.Ed.2d 214; United States v. Conti, 361 F.2d 153 (2d Cir.1966), vacated on other grounds 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035; and United States v. Keig, 334 F.2d 823 (7th Cir. 1964). We have carefully examined those cases and believe they are judicially sound.

## CONTENTION SIX

 Relying on United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L. Ed.2d 112 (1964) and Wild v. United States, 362 F.2d 206 (9th Cir.1966), appellant suggests that the lower court committed error in failing to exclude all exhibits acquired by the special agent, by use of an administrative summons under the provisions of 26 U.S.C. § 7602 (1964).

*Wild,* as well as *Powell,* pointedly recognizes that where the objective of the investigation is to obtain information which may be utilized in determining whether there is *civil liability* for a tax or a tax penalty, the obtaining of documents under the summons is legitimate, notwithstanding the fact that the information might, in the future, be also used in a criminal prosecution. Beyond all legitimate argument, the investigation in this case was conducted for a legitimate purpose. Recent cases sustaining this view are Howfield, Inc. v. United States, 409 F.2d 694, 697 (9th Cir. 1969); United States v. Ahmanson, 415 F.2d 785, 787 (9th Cir.1969); United States, et al. v. Ruggeiro, 425 F.2d 1069, (9th Cir.1970).

Affirmed.