UNITED STATES of America, Plaintiff-Appellee,

v.

Joel P. BEKOWIES, Defendant-Appellant.

No. 25407.

United States Court of Appeals, Ninth Circuit.

Aug. 24, 1970.

Rehearing Denied Oct. 29, 1970.

Morton A. Winkel (argued), Portland, Or., for appellant.

Wm. B. Borgeson, argued), Ass't U. S. Atty., Sidney I. Lezak, U. S. Atty., Portland, Or., for appellee.

Before CARTER, HUFSTEDLER and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge:

Joel Bekowies appeals from his conviction for harboring and concealing a federal fugitive, 18 U.S.C. § 1071, and for conspiring to do so, 18 U.S.C. § 371. Concurrent sentences were imposed. We reverse for failure of the law enforcement officers to give defendant his *Miranda* warnings.

The record shows that on February 14, 1969, three agents of the F.B.I. and a Portland police officer went to Bekowies' residence. They were armed with an arrest warrant for one James Nolen Davidson, wanted for violations of the Selective Service Act. Agent Hixon was assigned to cover the front of the residence "to make sure that nobody climbed out windows or doors." (R.T. 6, 7.) Agents McLeod and Kaspar, and Police Officer Boggs entered the rear of the residence and, after checking out several other apartments, entered that of Bekowies. (R.T. 30, 41, 81).

The officers identified themselves and were admitted by one Jeffrey Weil,[1] who was living in the apartment with Mr. and Mrs. Bekowies, but claimed that he knew nothing about Davidson. He stated that he, Bekowies, and Mrs. Bekowies were the only persons in the apartment. Weil's conversation with the officers took about fifteen minutes. (R.T. 57–58).

---

1. Weil was indicted for harboring Davidson and for conspiring to do so. He pleaded guilty to the harboring charge, and the Government dismissed the conspiracy count.

During this time Bekowies was in a bedroom of the apartment, with the door closed. Agent McLeod asked Weil to request Bekowies to come into the living room. (R.T. 8–9, 57). When the latter did so, Agent McLeod apparently thought that Bekowies might be Davidson, the fugitive. He carefully compared Bekowies to a photograph of Davidson, asked Bekowies to produce his identification, and examined Bekowies for scars that Davidson was known to have. Agent McLeod then concluded that Bekowies was not Davidson. (R.T. 21–23).

At this point he advised Bekowies that there was a warrant outstanding for the arrest of Davidson, read him the provisions of the federal harboring statute, 18 U.S.C. § 1071, showed him the photograph, and asked if he knew anything of Davidson's whereabouts. Bekowies said he did not. The agents then searched the apartment, with the exception of the bedroom. Bekowies told the officers that his wife was in bed, sick with the Hong Kong flu. (R.T. 58–59).

Agent McLeod then took Bekowies to the porch of the apartment. Again he read the provisions of the federal harboring statute, and pointed out that Davidson's car was parked at the curb in front of the house. Bekowies said that Davidson had perhaps been in the apartment at a party the night before, but was not then in the apartment. (R.T. 59).

The agents had come to Bekowies' apartment reasonably certain that Davidson was hiding there.[2] After his first questioning of Bekowies, Agent McLeod was "fairly well convinced that Mr. Bekowies was being quite untruthful with me." (R.T. 14). Agent Kaspar was also convinced of Davidson's presence in the apartment and, on learning that Bekowies would not allow a search of the bedroom, told Agent McLeod that, "I

can't leave this room—this apartment—without searching the bedroom." (R.T. 82).

The conversation on the porch followed Agent Kaspar's talk with Agent McLeod. After Bekowies had once again denied that Davidson was in the apartment, McLeod, according to his own statement, "insisted that we needed to search the apartment. We had already —prior to going out onto the porch, we had searched everything except a bedroom, and I insisted that he allow us to search the bedroom area." (R.T. 18). Faced with Agent McLeod's insistence, Bekowies yielded, and the agents found Davidson hiding under the bed. (R.T. 18, 82).

After Davidson was arrested and handcuffed, Agent McLeod telephoned the Portland Police Department "to insure that they had nothing of a wanted nature" on Bekowies. He discovered that Bekowies had an outstanding jaywalking ticket, and Officer Boggs placed him under arrest. (R.T. 19).

Bekowies was later released on the jaywalking charge, and was not arrested on the harboring charge until four days later, on February 18. (R.T. 23). At no time prior to his second arrest was he given his *Miranda* warnings or otherwise advised of his constitutional rights.

Bekowies moved to suppress the statements made to Agent McLeod.[3] At the hearing on the motion, Bekowies testified that although the agents were polite and courteous to him, and although none of them had ever explicitly told him he could not leave, nevertheless he felt that "as long as they had questions to ask me, I was to stay and answer them." (R.T. 45). He said he "never felt like I should leave," in view of the presence of the two or three agents in the room and the one he knew to be outside. (R.T. 46).

---

2. Their information came from an informant whose identity is not disclosed in the record.

3. He also moved to suppress several statements made after Davidson's arrest, and

one statement made after his own arrest February 18. These statements do not appear to have been made in response to questioning initiated by law enforcement officials. We do not hold these statements inadmissible.

The District Court seems to have accepted Bekowies' testimony, stating that "apparently [Bekowies] thought he couldn't leave, but he had no reasonable reason." The motion to suppress was denied.

■ The District Court purported to apply the doctrine of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as interpreted by our decision in Lowe v. United States, 407 F. 2d 1391 (9th Cir. 1969). In *Miranda*, as is well known, the Supreme Court held that a suspect must be warned of his constitutional rights prior to any custodial interrogation.

■ By custodial interrogation, the Court said, it meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," 384 U.S. at 444, 86 S.Ct. at 1612. The Court thus abandoned the inquiry, begun in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), as to whether a criminal investigation had focused on the accused.

■ After *Miranda*, the sole question is whether, at the time of his questioning by the police, the person questioned is "in custody." Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Custody will be found if the person questioned is effectively deprived of his freedom of movement, even though the interrogation occurs in his own home. Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

■ In Lowe v. United States, *supra*, Judge Carter in a carefully considered opinion held for this court that we would determine the existence of custody by applying the objective, reasonable man test earlier formulated by the California Supreme Court in People v. Arnold, 66 Cal. 2d 438, 58 Cal.Rptr. 115, 426 P.2d 515

(1967). Under it a suspect will be held to be in custody if the actions of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably have led him to believe he could not leave freely. *Lowe, supra*, 407 F.2d at 1397; *cf.* People v. Rodney P. (Anonymous), 21 N.Y.2d 1, 286 N.Y. S.2d 225, 233 N.E.2d 255 (1967); Myers v. State, 3 Md.App. 534, 240 A.2d 288 (1968).

Applying our rule, we have consistently refused to find custody in the usual tax-investigation case, since those interrogated by the Internal Revenue Service are normally free to come and go as they please. United States v. Chikata, 427 F.2d 385 (9th Cir. 1970); Simon v. United States, 424 F.2d 1049 (9th Cir. 1970); Spahr v. United States, 409 F. 2d 1303 (9th Cir. 1969).

Similarly, we have held that a highway patrolman may properly stop a motorist to ask for his driver's license and registration without giving the *Miranda* warnings, interrogations of that kind being so commonplace that it would be unreasonable under the circumstances for a motorist to conclude he was in custody. United States v. Edwards, 421 F.2d 1346 (9th Cir. 1970); United States v. Chase, 414 F.2d 780 (9th Cir. 1969); Lowe v. United States, *supra*.

■ We have also recognized that custody is to be determined under all the facts of the case, and that "for one to be in custody, it is not required that he be in handcuffs or even that he be advised in express terms that he is under arrest." Rosario v. Territory of Guam, 391 F.2d 869 (9th Cir. 1968).

■ In the case presently before us, Bekowies testified that at the time of Agent McLeod's questioning, he believed that he was not allowed to leave the room. That testimony apparently having been accepted by the District Court,[4]

4. In considering Bekowies' testimony that he believed himself not free to leave we do not, as the dissent suggests, depart from the objective standard of *Lowe*.

Bekowies' statements are relevant to the existence of his own subjective belief, not to the crucial legal question of whether that belief was reasonable.

the only question for us is whether, under the objective test of *Lowe, supra*, Bekowies' belief was reasonable. We conclude that it was.

In reaching our conclusion, we have not been influenced by any single circumstance but by the cumulative effect of this record. We set forth below the various considerations that have led to our conclusion that Bekowies, while talking to Agent McLeod, reasonably believed himself not free to leave. But we emphasize that we do not hold—and indeed do not necessarily think—that any of the facts we refer to, standing alone, would be sufficient to demonstrate that a suspect reasonably believed he was in custody.

*First*, we note that the agents were armed with a warrant for the arrest of Davidson when they entered the Bekowies' apartment. When officers are looking for a fugitive, and have reason to believe he is in a specific place, at least one circuit considers such an arrest warrant to be the equivalent of a search warrant. United States v. McKinney, 379 F.2d 259 (6th Cir. 1967).[5] And it has been held that a suspect whose home is being searched pursuant to a warrant is in custody for *Miranda* purposes. People v. Wilson, 268 Cal.App. 2d 581, 74 Cal.Rptr. 131 (1968).

*Second*, Agent McLeod at first thought that Bekowies was Davidson. While McLeod's belief persisted, Bekowies had of course ample reason to expect that McLeod would not let him leave the room.

*Third*, the agents had staked out Bekowies' apartment and this fact was known to Bekowies. Agent Hixon, placed in front of the residence, was specifically charged with assuring that no one left through the windows or doors. It cannot have been unreasonable for Bekowies to infer from Agent Hixon's presence an intention to interfere with his freedom of movement.

*Fourth*, the agents requested Bekowies to accompany them to several areas within the apartment. At the beginning of the interrogation, Agent McLeod got Weil to ask Bekowies to come out of the bedroom. Later he asked him to go out on the porch, where he continued the interrogation.

*Fifth*, the search of the bedroom was made only after Agent McLeod had "insisted" to Bekowies that it be made. The record does not show exactly why McLeod thought he had a right to "insist" on a search of the bedroom. But the fact that Bekowies' consent occurred only after McLeod had "insisted" suggests at the very least that it was not unreasonable for Bekowies to believe that he was no longer master in his own house.

*Sixth*, Agents McLeod and Kaspar were quite certain of their information that Davidson was in Bekowies' apartment. McLeod was confident, from the beginning of his interrogation of Bekowies, that the latter was not telling the truth. He therefore warned Bekowies of the provisions of the federal harboring statute, 18 U.S.C. § 1071, and questioned him closely and persistently. Recognizing as we do that the test is not whether the suspect is a focus of suspicion but whether he is in custody, it is neverthless true that close and persistent questioning, accompanied by a warning as to the provisions of a criminal statute and an evident belief by the interrogating officers that the suspect is lying, may reasonably induce in a suspect the belief that he is no longer free to go about his business without significant restraint. *Cf.* People v. Merchant, 260 Cal.App.2d 875, 67 Cal.Rptr.

Since, as the trial court found, Bekowies subjectively believed himself not free to leave, we have no occasion in this case to determine when, if ever, a suspect might be held to be objectively in custody despite his subjective and unreasonable belief that he was free to leave.

5. We express no opinion as to whether the law of this circuit is in accord with that of the Sixth on this point. The only question before us is the reasonableness of Bekowies' belief, and we find it imprudent to say that a layman could not reasonably believe what three federal judges have held.

459 (1968); Windsor v. United States, 389 F.2d 530 (5th Cir. 1968).

Finally, there is the fact that at the conclusion of the interrogation, Bekowies was indeed taken into custody. Had the agents simply arrested him for harboring a federal fugitive, we would draw no inference from their conduct, for at that time they had (*Miranda* problems aside) more than ample probable cause. But instead they went out of their way to discover some reason (we hesitate to say pretext), apart from the harboring charge, for keeping Bekowies in custody, and arrested him finally for a petty traffic offense.

It is true that this arrest occurred after the completion of the interrogation. But the subsequent arrest necessarily colors what went before, and it is difficult indeed to say that Bekowies was unreasonable in believing himself in custody when, as it turned out, his belief was correct.

■ Since we hold that the District Court erred in failing to exclude statements made by Bekowies to Agent McLeod during the course of interrogation, it is clear that a new trial will be required on both the harboring and conspiracy counts.[6] But we think it appropriate to point out that in this record there was insufficient evidence to submit the conspiracy count to the jury even had Bekowies' statements been properly admitted.

■ The indictment alleged a conspiracy between Bekowies and Weil to harbor Davidson in violation of 18 U.S. C. § 1071. To sustain a conviction under the latter statute, it is necessary to show that the defendant had "notice or knowledge of the fact that a warrant or process has been issued" for the fugitive. It is hornbook law that when knowledge of a fact is required to convict for a substantive offense, knowledge is also required to convict for conspiracy to commit the substantive offense. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); United States v. Ausmeier, 152 F.2d 349 (2d Cir. 1945); Fulbright v. United States, 91 F.2d 210 (8th Cir. 1937).

The only evidence in this record from which the jury could have inferred knowledge of the Davidson arrest warrant by either Weil or Bekowies was Agent McLeod's testimony that he had shown it to them. Hence the conspiracy cannot have begun before McLeod entered Bekowies' apartment.

■ From that time forward, there is no evidence of any communication between Weil and Bekowies—except for the occasion when Weil, at Agent McLeod's direction, asked Bekowies to come

---

**6.** We are unpersuaded by the suggestion in dissent that the error in admitting Bekowies' statements was harmless beyond a reasonable doubt. Bekowies could not have been guilty of the offense of harboring Davidson until "after notice or knowledge of the fact that a warrant or process [had] been issued" for Davidson. 18 U.S.C. § 1071. On this record, the only evidence of such notice was Agent McLeod's reading of the warrant to Bekowies. Hence, if the statements made to Agent McLeod be suppressed, there is slight evidence that Bekowies' conduct in connection with the search was other than exemplary *at any time after he had notice of the outstanding arrest warrant*. Absent such evidence, Bekowies' other statements are as compatible with innocence as with guilt.

In any event, it is hard to believe that evidence as damning as that contained in the statements improperly admitted— evidence that Bekowies had lied to and deliberately misled the agents—did not strongly influence the jury's verdict. *See* Chapman v. California, 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Nor is this a case where the challenged evidence was merely cumulative of facts overwhelmingly established *aliunde*, as in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). We note that the government's brief does not suggest that the error was harmless, nor challenge the appellant's statement in his opening brief that a new trial is required if any of the statements be excluded.

out of the bedroom. Nor was it possible to infer any such communication between the two, the F.B.I. agents having been in the apartment the whole period.

▮ Without communication between Weil and Bekowies, however, there could have been no agreement between them. Without agreement, of course, there can be no conspiracy. Ingram v. United States, supra; Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

Reversed.

JAMES M. CARTER, Circuit Judge (dissenting):

The majority reverses the convictions on two grounds. (1) Insufficient evidence to support the conspiracy conviction, and (2) Bekowies' statements were the product of impermissible police interrogation and should not have been admitted. I agree with the majority on the first point. I cannot, however, accept the conclusion of my brethren on the second.

The admissibility of Bekowies' statements to the police was thoroughly considered by the trial court at the suppression hearing. Bekowies and three investigating officers testified. The judge found "certainly no custody situation [was] involved on February 14 * * * Apparently [Bekowies] thought that he couldn't leave, but he had no reasonable reason * * * I would say that this case falls squarely within Lowe v. United States, except that I don't even think it gets that far." Relying on the same legal standard and evidence considered by the trial court, but without the opportunity to have heard and observed the witnesses, the majority concludes that Bekowies was in custody or significantly deprived of his liberty. I cannot agree.

The majority does not specify which statements of Bekowies should have been excluded by the trial court. In his brief Bekowies summarized the six incriminating statements he felt should have been excluded. They were: (1) his statement that he didn't recognize Davidson's picture or know anything about him; (2) his statement that Davidson was not there and that his [Bekowies'] wife had the flu; (3) "I did what I had to do."; (4) "Everyone must do his bit."; (5) "Well, I'm sorry, Jim [Davidson]. I tried," all made on February 14, 1969; and (6) "What more is there to say? I already did what I did." (Rep.Tr. 34). It is clear from the record that statement (6) occurred after Bekowies had been arrested on February 18 on the charge which led to the indictment, given a valid *Miranda* warning, and had agreed to talk. Statements (3), (4) and (5) were made in the apartment immediately after the arrest of Bekowies on February 14, 1969, on the traffic charge and were not made in response to any police interrogation but were *volunteered*. Therefore, even assuming the validity of the majority's custody argument, none of the last four statements should have been excluded, and all would be admissible on a retrial.

The majority twice states "The district court seems to have accepted Bekowies' testimony, stating that he thought he couldn't leave." [Opinion p. 12; p. 12]. Since the subjective thinking of Bekowies is not admissible under the objective standard, as demonstrated hereafter, there is no place in the opinion for a speculation as to whether the court accepted Bekowies' testimony as to his thoughts and beliefs.

But the majority reverses the conviction relying on Bekowies' statements that he didn't recognize Davidson's picture or know anything about him. These statements were made shortly after Bekowies had been called from the bedroom by Jeffrey Weil. The police first established that Bekowies wasn't Davidson, then told of the warrant for Davidson and read the provisions of the federal harboring statute. Bekowies denied knowledge of Davidson. As of this time, the majority would insist that a reasonable man would have assumed that Bekowies was subject to in-custody interrogation.

The trial court's finding would concern only statements (1) and (2), since the record clearly shows that statements (3), (4) and (5) were volunteered and (6) was made after the arrest on February 18, on the charges which lead to the indictment and after a full *Miranda* warning. The trial court also found that Bekowies had no reasonable reason to believe he was in custody and that the case fell squarely within Lowe v. United States (9 Cir. 1969), 407 F.2d 1391. This was a square finding that Bekowies was not in "custody or otherwise deprived of his freedom in any significant way." Miranda v. United States, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). We think the majority in error in this summary upset of a trial court's fact finding.

In addition, the facts showed that after Davidson was discovered in Bekowies' apartment, the officers called headquarters to ascertain if any charges were pending against Bekowies and found he was wanted on a warrant for jay walking. We think the officers followed proper police practice in checking to see whether warrants are outstanding for a suspect. There is a public interest in the apprehension of offenders, even traffic violators. However, the majority states "But instead they [the officers] went out of their way to discover some reason (we hesitate to say pretext) apart from the harboring charge for keeping Bekowies in custody, and arrested him finally for a petty traffic offense." [Opinion p. 14]. Such statements concern no issue in the case and have no place in an opinion of this court.

The majority, although purporting to follow *Lowe*, supra [407 F.2d 1391], actually departed from it completely. *Lowe* lays down an objective standard for determining custody (pp. 1396–1397) and considered particularly the intent of the officer. Such an objective standard would equally cover the intent of the defendant. People v. Arnold, 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967) stated that on retrial the trial

court should consider the language used by the Deputy District Attorney, the physical surroundings, "the extent to which the authorities confronted defendant with evidence of her guilt, the pressures exerted to detain defendant, and any other circumstances which might have led defendant *reasonably to believe that she could not leave freely.*" 66 Cal. 2d at 449, 58 Cal.Rptr. at 122, 426 P.2d at 522. [Emphasis added].

See Criminal Law and the Constitution—Sources and Commentaries, published by the Institute of Continuing Legal Education, Ann Arbor, Michigan, by Yale Kamisar. Ch. 4 thereof deals with "Custodial Interrogation Within the Meaning of *Miranda*." At page 362, Kamisar lists four alternatives, and chooses number (4):

"What determines whether a person being questioned is 'in custody'? (1) The subjective intention of the questioning officer to hold the person or to arrest him? (2) the degree to which the investigation has 'focused' on the person or, a variation of the same approach, whether or not the police have 'probable cause' to arrest the person? (3) The subjective belief of the person that he is significantly deprived of his freedom? (4) The belief of the person, as 'a reasonable man,' that his freedom is significantly impaired? It is submitted that approach (4) should be controlling."

In People v. Rodney P. (Anonymous), 21 N.Y.2d 1, 9, 286 N.Y.S.2d 225, 233, 233 N.E.2d 255, 260 (1967), the New York Court of Appeals per Keating, J. held that a defendant was not subjected to "custodial interrogation" and that *Miranda* warnings need not have been given, relying heavily on People v. Arnold, supra, and the particular language therein, to-wit, "custody occurs if the subject is physically deprived of his freedom in any significant way or is *led to believe, as a reasonable person,* that he so deprived," quoting from People v. Arnold, supra, 66 Cal.2d 438 at 448, 58 Cal. Rptr. 115, 426 P.2d 515 [Emphasis add-

ed]; and citing People v. Hazel, 252 Cal. App.2d 412, 442, 60 Cal.Rptr. 437, to the same effect. Judge Keating wrote:

"This [the test applied by the California courts] is the test which we hold to be the most reasonable. It gives effect to the purpose of the *Miranda* rules; it is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question * * * "

We think an objective standard means objective both as to any thoughts of the officer and of the defendant. When we look at the majority opinion we see that it is replete with references to testimony of what the defendant Bekowies "felt" or "believed." Bekowies is quoted as saying "he felt that 'as long as they had questions to ask me, I was to stay and answer them' "; that he "never felt like I should leave." [Majority opinion p. 11]. Thereafter the court dismissed the rule in *Lowe*, supra, and after citing People v. Arnold, supra, and citing with a Cf. People v. Rodney P. (Anonymous), supra, purported to apply the rule. Again Bekowies is quoted as saying "he believed that he was not allowed to leave the room" [Majority opinion, p. 12].

Although couching its conclusion in apparent reliance on the objective standard, to-wit " * * * Bekowies while talking to Agent McLeod, reasonably believed himself not free to leave," it is apparent that the majority relied extensively on Bekowies' subjective thoughts and expressions, Footnote #4 merely compounds the error.

Certainly this is not an application of "an objective standard for determining custody." The fact to be determined is *did the defendant as a reasonable man or did the defendant reasonably believe that he was not free to leave.* But the self serving statements of the defendant should not be admissible on this issue any more than the unexpressed intent of the officer in *Lowe,* supra. Instead of applying the rule of *Lowe, Arnold* and *Rodney*, the majority has clearly departed therefrom.

Assuming error was committed, I am convinced it was harmless. 18 U.S.C. § 1071, under which Bekowies was convicted, provides:

"Whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person, shall be fined * * * or imprisoned * * * *".

It is undisputed that Davidson was a fugitive from an arrest warrant, that he was discovered under Bekowies' bed, and that Bekowies knew that Davidson was a fugitive from a warrant. Bekowies' only possible defense would have been that he didn't know that Davidson was being harbored in his apartment. Yet the evidence rebutting this contention is overwhelming. It reveals: (1) Bekowies was in the bedroom in which Davidson was discovered for at least fifteen minutes shortly before Davidson was found. (2) Bekowies' wife was on top of the bed at the time Davidson was found. (3) Just after the apprehension, Davidson and Bekowies were heard discussing the disposition of Davidson's automobile, parked outside the apartment, and Davidson's clothes which were in the apartment. (4) Bekowies stated: "Everyone must do his bit." (5) Bekowies came over to Davidson and said, "Well, I'm sorry, Jim. I tried." (6) In custody, four days after the arrest of Davidson, Bekowies commented, "What more is there to say? I already did what I did."

I am unable to see how the admission of Bekowies' statements in response to police interrogation in the apartment added anything of significance to the overwhelming evidence proving that Bekowies was knowingly hiding David-

son to prevent his arrest. Taken from one perspective, the statements helped Bekowies by asserting his contention that he knew nothing of Davidson, in sum, that Davidson had been concealed without his knowledge. Viewed unfavorably to Bekowies, his statements indicated that he was lying to protect Davidson. This conclusion can only be firmly drawn, however, from the overwhelming independent evidence that Bekowies knew Davidson and was actively concealing him. Bekowies' answers may have been significant in determining the existence of a conspiracy between Bekowies and his roommate Weil. But we agree the conspiracy count should be reversed. It is therefor no longer in the case. As to the harboring charge, we are convinced beyond a reasonable doubt, any *Miranda* error was harmless. Chapman v. California, 386 U.S. 18, 84 S.Ct. 229, 11 L.Ed.2d 171 (1967).

The conviction under the conspiracy count should be reversed. The conviction under the harboring count should be sustained.