**Application of Harold Chester GUYETTE For a Writ of Habeas Corpus.**

**Civ. No. R-2464.**

United States District Court,
D. Nevada.

Feb. 29, 1972.

Robert List, Atty. Gen., by Herbert F. Ahlswede, Chief Deputy Atty. Gen., Carson City, Nev., for the Warden.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

BRUCE R. THOMPSON, District Judge.

Harold Chester Guyette, through his attorney, Byron K. Meredith, Esq., has tendered a petition for a writ of habeas corpus.

In 1966, Petitioner was convicted of first degree murder and sentenced to life imprisonment without possibility of parole. The conviction was affirmed by the Supreme Court of Nevada, 84 Nev. 160, 438 P.2d 244 (1968). Petitioner contends that an involuntary confession was relied upon to prove guilt and that the evidence was insufficient to justify the conviction. These same contentions were decided adversely to Petitioner by the Nevada Supreme Court, and, therefore, Petitioner has exhausted his state court remedies within the meaning of 28 U.S.C. § 2254.

*Factual Background*

Petitioner was convicted of the murder of Dean Briggs, son of the proprietress of the Briggs' Service Station near Fernley, Nevada. Although Mrs. Briggs was murdered at the same time, Petitioner was charged only with the murder of Dean Briggs. The murder was committed on March 12, 1966, at approximately one o'clock p. m.

Petitioner was arrested on April 1, 1966, in Elkhart, Indiana, on a traffic warrant and held for extradition to Nevada on the murder charge. Petitioner was indigent and requested the services of an attorney on April 4, 1966, during an interrogation. The police officer to whom the request was made stated that he would not pay for an attorney for Petitioner and that such action was up to the State of Nevada. The interrogating officer then handed Petitioner a telephone book and said that if he wanted an attorney, he could call one. Petitioner did not call an attorney and the interrogation continued.

On April 14, 1966, the District Attorney of Churchill County, Nevada flew

to Elkhart and interrogated Petitioner. Petitioner gave an exculpatory statement at that time concerning his trek across Nevada with his wife. The substance of this statement is set forth in the Evidence Summary which follows.

Petitioner waived extradition and was returned to Nevada on April 19, 1966. He was immediately taken to the scene of the crime and questioned about his involvement in the murders. Petitioner denied that he had ever been there and stated that he had no knowledge of the murders. On that same date, Petitioner again requested the services of an attorney. He was told by Sheriff Wilkins, of Churchill County, Nevada, that an attorney would not be appointed for him until he went to court. Several similar requests were made during the period of April 19 to April 27, and each time, Petitioner was told that he would have to wait until he appeared in court.

Petitioner's wife was also extradited to Nevada on the same murder charge, although the charges against her were dismissed in July, 1966. Petitioner was interrogated numerous times from April 1 through April 27. Petitioner claims that during these interrogations, he was told that his alibi did not check out,[1] that his wife had implicated him in the

double murder, that he should confess to save his wife, and that Mrs. Briggs was still alive when the Sheriff arrived at the service station.[2] Petitioner's responses during these periods of interrogation ranged from exculpatory to inculpatory. Petitioner was, for all intents and purposes, held incommunicado in a small solitary cell during his entire period of pre-trial incarceration.

At 5:30 o'clock p. m. on April 27, 1966, Petitioner was allowed to talk with his wife for a half hour in the District Attorney's Office.[3] Immediately following this visit, he signed a confession. Prior to taking the confession, the District Attorney warned Petitioner that he did not have to make a statement, that his statement would be used against him, and that he had the right to have an attorney present.[4] The confession is a short "I did it" narrative and contains several responses by Petitioner to questions asked by the District Attorney. The written confession is notable primarily for its brevity and its failure to recite any details of the killings such as motivation and how it happened that Briggs' body was in the restroom while Mrs. Briggs was found in the store. The warrant for Petitioner's arrest was not issued until April 27, 1966 (the

---

1. This was admitted at trial by Sheriff Wilkins. The alibi is fully set forth in the Evidence Summary which follows.

2. This was admitted at trial by Sheriff Wilkins. However, there is some question as to whether Sheriff Wilkins told Petitioner that Mrs. Briggs had identified Petitioner as the slayer.

3. Petitioner claims that this was the first and only time he was afforded an opportunity to talk with his wife since April 1, 1966. Sheriff Wilkins testified that it was Petitioner's second opportunity.

4. During the entire period of Petitioner's incarceration in Indiana and Nevada, he never received adequate Miranda warnings. More specifically, Petitioner was not told that if he could not afford an attorney, he had the right to have one appointed for him. This point is not an issue in this proceeding as the inadequacy of the warnings is admitted by the Respondent, the Supreme Court held the

warnings to be inadequate, and this Court holds the same. For cases which hold that an accused's Miranda rights are violated when the authorities fail to advise the accused that he has the right to have an attorney appointed if he cannot afford one, see, e. g., United States v. Oliver, 421 F.2d 1034 (10th Cir. 1970); Story v. State, 452 P.2d 822, (Okl.Ct.App.1969); Commonwealth v. Sites, 427 Pa. 486, 235 A.2d 387 (1967); Dailey v. Commonwealth, 208 Va. 452, 158 S.E.2d 731 (1968); Annotation, 10 A.L.R.3d § 7, at 1054–1063 (1971 Supp.). The April 27, 1966 warning given by the District Attorney was inadequate not only in form but in substance, in view of the overriding fact that Petitioner had been told previously that no attorney would be appointed until he went to court, and therefore, the warning as to an attorney's presence was meaningless. See, United States v. Garcia, 431 F.2d 134 (9th Cir. 1970).

same day as the confession), and also he was not arraigned until that date. Thus, Petitioner's arraignment and arrest were not effected until eight days after his return to Nevada and twenty-seven days after he was first incarcerated pursuant to the murder charge.

At trial, the April 27 confession and most of the other extra-judicial statements were admitted over the objection that they were inadmissible under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as applied to Petitioner's trial by Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). On appeal, the Nevada Supreme Court stated that although all except two volunteered statements were obtained in violation of *Miranda*, the error was harmless because such statements only corroborated voluntary statements made by Petitioner. The Nevada Supreme Court ruled that the April 27 confession was voluntary.

■ Counsel was not appointed to represent Petitioner until May 3, 1966, thirty-three days after Petitioner was first incarcerated and twenty-nine days after his first request for the assistance of an attorney. In April of 1966, Petitioner could best be described as a poorly educated, twenty year old transient. These facts, together with the circumstances surrounding the interrogations and incarceration of Petitioner, fully warrant the conclusion that Petitioner did not at any time knowingly and intelligently waive his right to counsel. As he was not advised of his right to have an *appointed* counsel present at the interrogations, it would be extremely difficult to conclude that he waived a right of which he was unaware. Furthermore, the presumption is against such waiver, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1937), and nothing has been presented to this Court which would be sufficient to overcome the presumption.

*Evidence Summary*

The following two series of paragraphs summarize the relevant evidence in this case and aid a more objective view thereof. The first series of paragraphs consists of evidence in support of the defense alibi, and the latter series of paragraphs consists of evidence in support of the State's case.

## DEFENSE

Deputy Sheriff Garrett purchased five gallons of gasoline for Petitioner's car at Bud's Service Station, Fernley, Nevada between five and six o'clock p. m. on March 11, 1966. He also purchased roast beef sandwiches for Petitioner and Petitioner's wife at the Country Cafe, Fernley, Nevada, immediately after the gasoline purchase. He identified Petitioner and his car at the trial. The receipt from Bud's Service Station, signed by both Petitioner and Deputy Sheriff Garrett, was admitted in evidence at trial.

Mr. Stone was a waiter in the restaurant at the Midway Truck Stop between Lovelock and Winnemucca, Nevada. The Midway Truck Stop is approximately seventy miles northeast of Fernley, Nevada. Mr. Stone identified Petitioner, his wife and his car as being at the restaurant on March 11, 1966, between eight and ten o'clock p. m. He also noted that when Petitioner left the truck stop, he was headed east.

Mr. DiGrazia was the owner of a gas station, restaurant and motel complex in Valmy, Nevada. Valmy is approximately seventy-five miles east of the Midway Truck Stop. He identified Petitioner's car as being parked near his gas station at 7:30 o'clock a. m., March 12, 1966, when he arrived at work. He also identified Petitioner as the purchaser of a small amount of gasoline around 8:30 o'clock a. m. on the same date. Mrs. Hunter was a waitress in DiGrazia's restaurant and substantiates Mr. DiGrazia's story. She identified Petitioner's car as being parked at the gas station around eight o'clock a. m., when she came to work on March 12, 1966. She noted that the car was gone by ten o'clock a. m.

Mr. Wallace was the son of the woman who owned Rixie's at Dumphy, Nevada. Rixie's is approximately thirty miles east of Valmy, Nevada. He observed and identified Petitioner and his wife as being at Rixie's around noon, March 12, 1966. He also observed Petitioner when he sold his boots and his wife's brooch to Mr. Wallace's mother in exchange for gasoline and identified the boots and brooch at the trial. The boots and brooch identified as the items exchanged for gasoline at Rixie's around noon, March 12, 1966, were admitted in evidence at trial. Mr. Chase, a resident of one of the rented rooms at Rixie's, identified Petitioner's wife and German Shepherd dog as being at Rixie's around eleven o'clock a. m. on March 12, 1966.

Mrs. Schmidt was the owner of the Carlin Coffee Shop on Highway 40, Carlin, Nevada. The Carlin Coffee Shop is approximately twenty-two miles east of Rixie's. She identified Petitioner and his wife as the couple to whom she gave a meal in exchange for their washing the coffee shop windows and Petitioner dumping her garbage. She testified that Petitioner and his wife were at the coffee shop from around twelve noon to two o'clock p. m., March 12, 1966. She also identified Petitioner's car and his dog as being at the coffee shop during the same period. It should be noted that it was during this period of time that the Briggs were murdered at the Briggs' Service Station some one hundred ninety-seven miles west on Highway 40. Mrs. Dunnie corroborates Mrs. Schmidt's testimony although while on the stand, she was somewhat incoherent. Mr. Bishop was the operator of a gasoline station next to the Carlin Coffee Shop. He identified Petitioner, his wife, car and dog as being at the coffee shop between one o'clock p. m. and 2:30 o'clock p. m., March 12, 1966. He also observed Petitioner and his wife washing the windows during that same period.

Mr. Nelson was the station manager of Slim Olson's Truck Stop, two miles west of Elko, Nevada and approximately two hundred thirty miles east of Fern-ley, Nevada. He observed Petitioner and his wife at the truck stop some time after 2:30 o'clock p. m., March 12, 1966, and testified that they had departed before five o'clock p. m. on the same date. He identified Petitioner at the trial, remembering Petitioner and his wife because Petitioner's wife had spent a considerable amount of time in the tire shop. She was talking to a truck driver who was repairing a tire with a new tube which the driver had purchased from the truck stop. Mr. Johnson was a station attendant at Slim Olson's Truck Stop. He identified Petitioner and his wife as arriving at Slim Olson's around three o'clock p. m., March 12, 1966, and departing around 4:30 o'clock p. m. He filled Petitioner's car with $3 worth of gasoline because the truck driver who had been repairing his tire left an hydraulic jack as security for the purchase. He also identified Petitioner's car and dog.

Petitioner testified that his 1952–1953 faded red Ford convertible was capable of a top speed of only 40–50 miles per hour.

## STATE'S CASE

Mr. Draper was a customer at the Briggs' Service Station around 12:30 o'clock p. m., March 12, 1966. He identified Petitioner as being at the Briggs' Service Station at that time, particularly remembering a dirty fuzzy jacket allegedly worn by Petitioner. He did not observe Petitioner's wife, car or dog at the scene. Mr. Ferrari also stopped at the Briggs' Service Station on the same date. He identified Petitioner as being present at the gas station around 12:45 o'clock p. m., distinctly remembering a fuzzy coat being worn by Petitioner at that time. He did not observe Petitioner's wife, car or dog as being present. It should be noted that no fuzzy jacket was ever found in Petitioner's possession, nor was one presented in evidence.

Mr. Edwards was an appliance store operator in Elkhart, Indiana. He stated that Petitioner offered to trade a pistol

for another pistol in his store on April 1, 1966. Mr. Edwards never saw the proffered pistol. It should be noted that the Briggs were murdered with a .25 caliber pistol which was never found.

Mr. Yoder is the stepfather of Petitioner's wife. He testified that he overheard a short conversation between Petitioner and his wife some time in February or March, 1966. The substance of that conversation was that Petitioner's wife asked Petitioner what he was going to do about the "little lady he knocked off" in the filling station and Petitioner answered, "Oh, nothing, nothing." Evidence was introduced at trial which tended to show ill feelings between Mr. Yoder and Petitioner.

■ Chief Deputy Sheriff Keck, Elkhart, Indiana, transported Petitioner from Elkhart to Goshen, Indiana, immediately after Petitioner's extradition hearing on April 7, 1966. He testified that Petitioner, without any questioning, voluntarily stated: "I don't really have anything to worry about. They don't have the gun in Nevada. * * * I don't have anything to worry about because my wife is the only witness and she can't testify against me." [5] Petitioner rebutted the incriminatory substance of these statements on the stand at trial.

All of the following testimony was admitted at trial, although none of the statements to which the witnesses testified was elicited after adequate *Miranda* warnings were given to Petitioner:

Lt. Schmul, Elkhart Police Department, testified that during an interrogation of Petitioner on April 6, 1966, Petitioner stated that he would be willing to admit the killings if his wife would.

Inspector Stiver, Elkhart Police Department, testified as a witness to an interrogation of Petitioner by the District Attorney of Churchill County, Nevada on April 14, 1966, in Elkhart, Indiana. He testified that Petitioner told the District Attorney that he had spent the night of March 11, 1966 in *Fernley*, Nevada. However, the remainder of Petitioner's April 14 statement fits perfectly and in chronological order with the testimony of the defense witnesses. Inspector Stiver related that Petitioner stated that he purchased gas early on the morning of March 12, 1966, and shortly thereafter sold his boots and his wife's brooch, and again shortly thereafter he and his wife washed windows for their lunch. This story would seem to indicate that Petitioner confused the names of *Fernley* and *Valmy*, as the April 14 statement and the defense alibi match perfectly except for the name of Fernley. In addition, the Petitioner denied any knowledge of the Briggs slayings in his statement to the District Attorney and Inspector Stiver.

Sheriff Wilkins, Churchill County, Nevada, testified as a witness to Petitioner's confession and the signing of the confession on April 27, 1966. He testified that Petitioner stated that he shot the man and woman and threw the gun away in Iowa. Petitioner's written statement was admitted into evidence in addition to Sheriff Wilkins' testimony.

Undersheriff Danberg, Churchill County, Nevada, testified that on June 14, 1966, Petitioner told him that the situation looked hopeless and that he said: "I have done some awfully crazy things in my life . . . shoplifting, now murder." He further testified that Petitioner stated that he got into an argument with Dean Briggs, then shot him and moments later shot his mother.[6] In rebuttal, Petitioner denied that he had admitted the killing of the Briggs.

## OPINION

There is no doubt that the testimony of Lt. Schmul and Inspector Stiver, con-

---

5. These statements must be considered admissible as spontaneous statements made by Petitioner and, therefore, they are excepted from the *Miranda* rule. United States v. Bekowies, 432 F.2d 8 (9th Cir. 1970).

6. Petitioner's statements were supposedly all volunteered, but as Undersheriff Danberg had asked questions in relation thereto, the record is ambiguous with respect to whether this critical confession is outside the *Miranda* proscriptions.

cerning the statements made by Petitioner, was improperly admitted in evidence at the trial. Petitioner was not apprised of the fact that he had the right to an appointed attorney prior to the interrogations in which the statements were obtained. In addition, there is no evidence before this Court tending to show a knowing and voluntary waiver of this right by Petitioner, and there is considerable evidence to the contrary.[7] Petitioner's request for an attorney prior to either of these interrogations was denied. In Henderson v. Dutton, 397 F.2d 375 (5th Cir. 1968), the Court held that a state prisoner was entitled to a writ of habeas corpus where counsel was not appointed upon request and no showing was made by the State of an effective waiver. Therefore, at the very least, this testimony should not have been admitted at trial due to the application of the exclusionary rule and *Miranda*. United States v. Bekowies, 432 F.2d 8 (9th Cir. 1970); Rolland v. People of State of Michigan, 320 F.Supp. 1195 (E.D.Mich.1970); United States v. Harrison, 265 F.Supp. 660 (S.D.N.Y.1967); also see cases cited in note 3, *supra*.

■ The Respondent contends that the admission of the testimony of Lt. Schmul, Inspector Stiver and Undersheriff Danberg was harmless error because it only corroborated Petitioner's voluntary statement of April 7, 1966 to Chief Deputy Sheriff Keck and his "voluntary" confession of April 27, 1966.[8] While the harmless error rule has played various roles in the different jurisdictions' decisions concerning *Miranda* situations, this Court is of the opinion that the rule applies to Miranda-type

problems. Cf., Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). However, the Court must be convinced beyond a reasonable doubt that the subject testimony was harmless and did not affect the jury's verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In the present case, Respondent urges that three separate testimonials concerning admissions by Petitioner only corroborated two inculpatory statements, and as the three were only supplementary, it was harmless error to admit them. In view of the defense evidence offered at trial, this Court is not convinced that the error was harmless. However, a decision on this matter is unnecessary, for it would be predicated on the assumption that the April 27, 1966 confession was voluntary and therefore admissible.

■ It is the decision of the Court that the above "assumption" is incorrect. While there is a multitude of case law which holds that any statements elicited from an accused subsequent to inadequate *Miranda* warnings are inadmissible,[9] the instant case offers a bevy of substantive grounds demonstrating the involuntariness of the confession. As a result, reliance on much of the case law is unnecessary. In this case, Petitioner was a young, poorly educated transient who, from the beginning, insisted that he was innocent. He tendered an alibi early in his incarceration which was well substantiated at trial by ten apparently reliable witnesses. He requested the services of an attorney but was denied the same. At this point, Petitioner had effectively invoked his constitutional right to counsel and to re-

---

7. See text at page 1072 of this opinion with regard to the question of waiver.

8. The "voluntariness" of the April 27 confession is discussed post.

9. See, *e. g.*, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); United States v. Bekowies, 432 F.2d 8 (9th Cir. 1970); Klampert v. Cupp, 437 F.2d 1153 (9th Cir. 1970); Henderson v. Dutton, 397 F.2d 375 (5th Cir. 1968); United States v. Oliver, 421 F.2d 1035 (10th Cir. 1970); State v. Saunders, 102 Ariz. 565, 435 P.2d 39 (1967); State v. Michael, 103 Ariz. 46, 436 P.2d 595 (1968); People v. Flannigan, 251 Cal.App.2d 727, 59 Cal.Rptr. 800 (1967); People v. McFall, 259 Cal. App.2d 172, 66 Cal.Rptr. 277 (1968); Hunt v. State, 2 Md.App. 443, 234 A.2d 785 (1967); Jimenez v. State, 208 So.2d 124 (Fla.App.1968); People v. Bryant, 87 Ill.App.2d 238, 231 N.E.2d 4 (1967).

main silent, yet the interrogations continued until a confession was obtained some twenty-seven days later. "[A]ny statement taken after [the accused] invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

■ The burden is upon Respondent here to demonstrate that the confession was obtained in the absence of compulsive or coercive influences, inadequate *Miranda* warnings having been given. Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Respondent has not met this burden. On the contrary, numerous compulsive and coercive influences, in addition to those stated in the preceding paragraph, were obviously present prior to and on April 27, 1966. Although Respondent claims that the confession was "voluntary," the interrogatory form of the confession and the circumstances preceding it necessarily cause the "voluntariness" claim to become highly questionable. Petitioner was held almost incommunicado in a small isolated cell. He was repeatedly interrogated. He was told that his alibi did not check out by both Sheriff Wilkins and Deputy Bailey. He asked for an attorney to be appointed and was either denied his request or told that he would have to wait until he went to court. He was possibly told that he should confess in order to save his wife and that his wife had implicated him in the double murder. He was told that Mrs. Briggs had survived for several hours and possibly was told that she had identified him. He was incarcerated for nineteen days before extradition to Nevada. More importantly, he was incarcerated for eight days in Nevada before he was "arraigned" or the arrest warrant issued. During this incarceration period in Nevada, he was frequently interrogated as to his involvement in the crime for which he was being held but for which he had not yet been charged.

Under these circumstances, it is a reasonable inference that the purpose of the procedures employed by the State in April of 1966 was to prevent Petitioner from talking to an attorney until a confession had been obtained. This type of action was specifically condemned in Escobedo v. Illinois, 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977 (1964), wherein the Court stated:

> "When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of 'an unsolved crime' * * *. Petitioner had become the accused and *the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so.*" (Emphasis added.)

It is equally clear that the tactics employed by the State were the direct cause of the attrition of Petitioner's claims of innocence. Accordingly, this Court holds that the April 27, 1966 confession was induced by coercive and compulsive influences. Thus, the confession was not "voluntary" in any realistic sense of the word and was inadmissible. See, Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Moreover, such a confession, obtained subsequent to inadequate Miranda warnings, is *per se* inadmissible. Klampert v. Cupp, 437 F.2d 1153 (9th Cir. 1970); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ In view of the foregoing reasons, the conclusion is inescapable that the admission of the April 27, 1966 confession and the admission of the testimony of Lt. Schmul, Inspector Stiver, Undersheriff Danberg, and Sheriff Wilkins concerning incriminatory statements made by Petitioner were prejudicial errors. Furthermore, it is quite probable that the admission of that evidence played a substantial role in Petitioner's conviction. Accordingly, the admission of that evidence was not harmless error but was a denial of Petitioner's right to due process of law under the Fourteenth Amendment to the United States

Constitution. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

This conclusion has been reached with reluctance. One wonders why anyone would confess a horrible crime which he did not commit, yet it is well known that this is not a unique occurrence. In this case, the eyewitness identifications of Petitioner by the witnesses Draper and Ferrari placing him at the Briggs' station at about the time of the crime are suspect. The circumstances of these identifications, when initially made, were never developed in the record. Both witnesses recalled a non-existent fuzzy jacket as the principal identifying mark. No other reason is given why they should have remembered this Petitioner and observed him sufficiently to identify him in different clothing. If the identifications are accurate, the alibi witnesses produced by Petitioner are wrong on the dates. Yet each of them gave much more persuasive reasons for remembering Petitioner and the date and time of his presence with his peculiar red convertible, his wife and his dog than did the at-the-scene identification witnesses for remembering him at all. The record as a whole is one in which any wrongfully admitted evidence linking Petitioner directly to the crime would be prejudicial error. This Court certainly cannot affirm beyond a reasonable doubt that the admitted errors were not prejudicial.

We are limited by the record before the Court. Perhaps more thorough investigation, even at this late date, may develop the inaccuracies in the alibi evidence. Perhaps more thorough interrogation will support the strength of the at-the-scene identification testimony. How were these witnesses discovered? Did they describe Petitioner before seeing him? What were the descriptions? Were they told that he had confessed before they identified him? These are examples of areas where further exploration is justified. Also, it may well be that the last minute testimony of Undersheriff Danberg of his conversation with

Petitioner on June 14, 1966 is admissible if the statements were in fact all volunteered and not elicited by interrogation. The record is not completely clear and can be made clear. This conversation resulted in the only so-called confession which, in context and detail, has much weight, yet it is notable that nothing in it is corroborative of what Mr. Draper and Mr. Ferrari testified they saw the defendant doing.

This Court does not independently reach the conclusion that the admission of the incriminating statements at trial compels the granting of Petitioner's application for a writ of habeas corpus. In United States v. Garcia, 431 F.2d 134 (9th Cir. 1970), the Ninth Circuit Court of Appeals was presented with a very similar *Miranda* problem. After a careful review of Garcia's conviction, the Court stated:

"Error in admitting Garcia's inculpatory statements obtained in violation of Miranda v. Arizona, (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, compels reversal of her conviction and a remand for a new trial from which those statements will be excluded.

"After Garcia was arrested, federal agents repeatedly questioned her. During the course of the interrogation sessions, the agents gave her several different versions of the Miranda bundle of warnings. On no occasion was a warning given fully complying with Miranda. Taken together, the warnings were inconsistent. At one point she was told that she had a right to the presence of counsel 'when she answered any questions'; on another, she was told that she could 'have an attorney appointed to represent you when you first appear before the U. S. Commissioner or the Court.'

"The warnings failed to adequately inform Garcia of her right to counsel before she said a word. '[T]he offer of counsel must be clarion and firm, not one of mere impressionism.' Lathers v. United States (5th Cir. 1968) 396 F.2d 524, 535. (Accord,

United States v. Vasquez-Lopez (9th Cir. 1969) 400 F.2d 593; Gilpin v. United States (5th Cir. 1969) 415 F. 638.)"

Precisely the same situation is presented in this Petitioner's case. He was not given adequate *Miranda* warnings. At one point, he was told that he had the right to have an attorney present (just prior to the April 27 confession), and at another point, he was told that no attorney would be appointed until he went to court. In view of *Garcia*, the conclusion is unavoidable that Petitioner's conviction was unconstitutionally obtained.

It hereby is ordered, adjudged and decreed that the Application for a Writ of Habeas Corpus be, and it hereby is, granted, and the Writ directing Petitioner's release shall be issued upon application by Petitioner not sooner than thirty (30) days from the date of this Order. The purpose of the delay is to afford the State of Nevada an opportunity to take such further proceedings as it is advised with respect to the charges against Petitioner.